800 A.2d 216 (2002)
352 N.J. Super. 385
David L. ROSENBERG, deceased, by Rita B. Rosenberg, Executrix and Administratrix ad Prosequendum of the Estate of David L. Rosenberg, deceased, and Rita B. Rosenberg, individually, Plaintiffs-Appellants,
v.
Ranjana TAVORATH, M.D., Memorial Sloan-Kettering Cancer Center at Northwest Covenant Medical Center, Northwest Covenant Medical Center, and Memorial Sloan-Kettering Physicians at Northwest Covenant Medical Center, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 2002.
Decided June 27, 2002.
*219 Adrian I. Karp, Morris Plains, argued the cause for appellants.
Peter L. Korn argued the cause for respondents (McDonough, Korn & Eichhorn, attorneys; Mr. Korn, Springfield, of counsel; William S. Mezzomo, on the brief).
Before Judges NEWMAN, FALL and AXELRAD. *217
*218 The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
Plaintiff, Rita B. Rosenberg, the executrix and administratrix ad prosequendum of the estate of her deceased husband, David L. Rosenberg, appeals from the grant of an involuntary dismissal of the complaint at the close of plaintiff's case. The judge ruled that plaintiff's expert failed to delineate a standard of care or a departure from any standard, or that any alleged deviation of care was a proximate cause of decedent's death.
Decedent, a former smoker, suffered from laryngeal cancer, specifically stage III squamous cell carcinoma, which is treatable. In November 1997, he was referred to Dr. Elliot Strong, a cancer surgeon specializing in head and neck surgery, at Memorial Sloan-Kettering Cancer Center ("MSKCC") in New York City. Dr. Strong recommended treating the disease with two to three cycles of chemotherapy, a few weeks apart, and then determining what the results were in terms of shrinking the cancer which could then be radiated, as an alternative to surgery, in order to preserve the patient's larynx and ability to speak. In the event the prescribed course of treatment was not effective, Mr. Rosenberg would have the option of undergoing surgery for the removal of his larynx and the placement of a prosthetic voice box.
As Dr. Strong did not have anything to do with determining which chemotherapy drugs were used or the dosage, and he did not manage patients on chemotherapy, he referred Mr. Rosenberg to Dr. Karen Schupak, a radiation therapist who practiced at MSKCC's "satellite facility" at Northwest Covenant Medical Center ("Northwest") in Denville, New Jersey, which was closer to decedent's home. Dr. *220 Schupak referred Mr. Rosenberg to defendant, Ranjana Tavorath, M.D., a board-certified medical oncologist also practicing at MSKCC's Northwest satellite facility.
In accordance with MSKCC's larynx preservation protocol ("LP protocol"), which sets forth the dosages and schedules for administering the chemotherapy, Dr. Tavorath's plan of treatment involved administering two cycles of chemotherapy, containing a combination of cisplatin and fluorouracil, over a three-to-four-week schedule. Every record of treatment by Dr. Tavorath was sent to both Drs. Strong and Schupak. Mr. Rosenberg was administered out-patient chemotherapy treatment over a five-day period beginning on December 17. Thereafter, he experienced complications including nausea, high fever, severe diarrhea, low blood count, and dehydration requiring his hospitalization from December 28 through January 2, 1998. During this hospitalization, he was treated by Dr. Ephraim S. Casper, Dr. Tavorath's supervisor and the Chief of MSKCC's site at Northwest.
On January 6, 1998, Dr. Tavorath evaluated Mr. Rosenberg for his second cycle of chemotherapy. She determined he was substantially recovered from the prior toxicities and administered an identical second round of chemotherapy beginning the next day through January 11, 1998.
On January 17, 1998, due to a 104° fever, Mr. Rosenberg was treated in the emergency room and placed on a respirator, before being admitted to the intensive care unit for management of what appeared to be a sepsis syndrome. He was diagnosed as suffering from "chemotherapy-induced neutropenic fever ... complicated by dehydration" and septic shock. Despite treatment, his condition worsened. On January 19, 1998, decedent died as a result of septic shock, induced by chemotherapy neutropenia and toxicity, which caused multiple organ failure.
Plaintiff brought the instant medical malpractice action against Dr. Tavorath, MSKCC[1] and Northwest, and fictitiously pleaded MSKCC doctors,[2] seeking to recover damages for her husband's injuries, pain and suffering, and wrongful death, among other things, arising from the alleged malpractice of defendant Tavorath in failing to properly monitor decedent's response to chemotherapy and in failing to properly treat the complications which resulted from the treatment.
Plaintiff's theory at trial, as presented by her expert, Luis Villa, M.D., was that Tavorath's negligence in failing to modify the second course of chemotherapy caused decedent's death. Plaintiff also asserted that Dr. Tavorath violated MSKCC's LP treatment protocol which required a "team approach" by Drs. Strong, Schupak and Tavorath in evaluating her husband's condition after each cycle of chemotherapy, and that such violation was evidence of negligence.[3] The claims against MSKCC *221 and Northwest were brought under the theory of respondeat superior. The first three counts alleged a wrongful death and survival action against Tavorath, MSKCC, and Northwest, respectively. The fourth count sought damages for decedent's pain and suffering. The fifth count alleged the negligence of various fictitiously pleaded tortfeasors pending amendment of the complaint to reflect their true identities. The sixth count sought damages for loss of consortium.
A jury trial was conducted before the Law Division on several dates between June 5 and June 11, 2001. Plaintiff and her adult son Stuart testified, along with Dr. Villa and an economist, Dr. Marcus.[4] Plaintiff's counsel also read into the record the deposition testimony of Drs. Strong, Tavorath, and Casper.
Following the close of plaintiff's evidence on liability,[5] but prior to testimony on damages, defendants moved for an involuntary dismissal on the ground that Dr. Villa's testimony was insufficient to establish a prima facie case of medical malpractice because: (1) he offered only his net opinion on the appropriate standard of care unsupported by reference to any medical literature or case studies; (2) he testified that there was no standard of care regarding dose modification, or, that it ranged from a 5% to 25% modification and, therefore, his testimony was too imprecise and lacking in parameters to assist the jury; and (3) his testimony on proximate cause was lacking because he did not supply "some percent ... in reasonable medical probabilities" demonstrating that a dose reduction would have influenced the outcome.
Following oral argument, the trial court granted defendants' motion. A judgment dismissing the complaint was entered in accordance with the court's decision on June 25, 2001.
On appeal, plaintiff alleges that the court erred in dismissing the complaint because: (1) the testimony of her expert was sufficient to make out a prima facie case of medical malpractice for submission to the jury; and (2) the court failed to rule on plaintiff's "preserved claim" that Tavorath's violation of MSKCC's treatment protocol constituted negligence.

I.
As to the first issue on appeal, plaintiff argues that the court erred in finding that Dr. Villa: (1) failed to establish a standard of care because he did not specify the basis of his opinion that dose modification was required and, by implication, that he offered only a "net opinion;" (2) failed to establish proximate cause because he did *222 not precisely quantify the appropriate dose reduction and its corresponding effect on toxicity; and (3) exceeded the scope of his written report and deposition testimony in testifying that even a 5% reduction would have satisfied the standard of care. According to plaintiff, Dr. Villa established a standard of care, a deviation therefrom, and proximate cause, premised upon his own training and experience as an oncologist, and supported by reference to decedent's hospital records and articles authored by Dr. Marshall Posner, defendants' expert. In addition, plaintiff asserts that Dr. Villa did not testify outside his area of expertise or exceed the scope of his report or deposition testimony. Plaintiff further argues that Dr. Villa was not required to quantify his opinion that a dose reduction would have lessened the severity of the toxic effects of the chemotherapy since he explained why it was not possible to do so. Based on our review of the record and applicable law, we conclude that Dr. Villa's testimony was sufficient to submit the case to the jury. Furthermore, the trial judge did not rule on plaintiff's "preserved claim" that Tavorath's violation of MSKCC's treatment protocol constituted negligence. Accordingly, we reverse the judgment and remand the case for a new trial on all issues.
The trial court accepted Dr. Villa as a qualified expert in oncology. Dr. Villa opined that, based upon his review of decedent's hospital records, Dr. Tavorath deviated from the accepted standards of oncology in treating decedent by failing to reduce the dosage of the second round of chemotherapy. Plaintiff's expert maintained that decedent's death from the complications of chemotherapy was entirely avoidable had the second cycle been modified. According to Dr. Villa, the deviation occurred when Dr. Tavorath failed to recognize that the significant toxicity suffered by decedent following the first cycle of chemotherapy warranted a dose modification for the second cycle. Dr. Villa opined that a dose modification of about 10% to 25% would have avoided or lessened the severity of some of the complications decedent experienced after his first cycle; however, without having examined decedent, he could not say what the precise dose modification should have been.
Dr. Villa further testified that the initial dose of any chemotherapeutic drug is determined by reference to protocols which take into account a patient's height, weight, and body area, but that any subsequent dosage must be determined based upon the individual patient's response and the doctor's experience, taken together with the protocols. Where a patient has a response that is "far too toxic," an adjustment must be made where there are unacceptable or life-threatening side-effects.
Dr. Villa testified as to several toxic reactions and complications suffered by decedent following the first cycle, including neutropenia, which was confirmed by the drop in his white blood cell count from normal levels to very low levels, and left the patient with no protection against bacterial infection; reduction in appetite and significant weight loss; severe diarrhea; mucositis, which causes sores to develop in the protective mucus linings of the nose, mouth, and anus, thereby allowing bacteria to enter the body; and bowel "ileus," a chemotherapy-induced injury to the electrical mechanism of the bowel interfering with bowel movements. According to Dr. Villa, based upon the totality of all these toxicities, Dr. Tavorath should have realized that administration of a second identical course of chemotherapy was likely to cause a greater toxicity resulting in more serious complications or even death, and then used her judgment as an oncologist to modify the dose appropriately. Dr. Villa concluded, within a reasonable degree of *223 medical probability, that the administration of the second cycle of chemotherapy at the identical dosage as the first cycle, proximately caused decedent's death.
When pressed by defense counsel on cross-examination to quantify the appropriate dose reduction in decedent's case, Dr. Villa stated that the purpose of his testimony was not to establish the exact dosage or to prove that Tavorath was not well-qualified, but simply to demonstrate that "a change should have been made ... and if ... Tavorath had made a five percent change," Dr. Villa would not have testified on plaintiff's behalf even if decedent had died.
Dr. Villa testified regarding his familiarity with the chemotherapy drugs administered to decedent. However, he admitted that he was not familiar with the details of MSKCC's protocol regarding "the measurements that are used to make certain clinical decisions." Dr. Villa, however, maintained that given the "significant toxicity" suffered by decedent as a result of the first cycle of chemotherapy, the "majority of clinical oncologists" would have modified the second dose based upon decedent's clinical presentation evincing a "severe toxicity" after the first course of chemotherapy.
In granting defendants' motion, the trial court stated in pertinent part:
A fair reading of the doctor's [Villa's] testimony, giving all inferences to the plaintiff, suggests that the doctor found that Dr. Tavorath deviated because she failed to do something in connection with reduction of dosage following Mr. Rosenberg's hospitalization between the first and second doses of chemotherapy.
When it came to quantification, the doctor had testified in his depositions on one occasion that the standard would require a dosage modification of ten to 15 percent with a higher dosage modification if there were problems between the second and the third rounds of chemotherapy.
And at another point in his testimony at depositionand this was all brought out at trialhe said that one should start on the second round at a 25 percent reduction. And then if there was a good reaction, then perhaps there could be a lesser reduction in the third round to the ten to 15 percent level.
The doctor then went furtherand this was clearly beyond anything that he said in his depositionto say that if Dr. Tavorath had reduced the dosage of chemotherapy... [by] five percent that he would not have been there, that there would be no negligence under the circumstances regardless of whether Mr. Rosenberg had died or had not died. By doing so, Dr. Villa set up a standard of care that had no precise quantification and, in essence, was that so long as some form of modification occurred, that would be sufficient.
For that reason, the standard of care established by Dr. Villa is not one that can be easily followed in any respect because it is not one that establishes for a clinician what it is that needs to be done, or what signs and symptoms would allow a person to make a reasoned choice between various [chemo] therapeutic modification[s]....
In addition to not establishing a standard for the dose modification, the doctor did not in any sense specify what the criteria were that would permit a doctor to determine [by] how much a dose should be modified. He gave the opinion that because Mr. Rosenberg had been hospitalized and had suffered significant toxicity leading to that hospitalization, there must be a modification.
He said further that the modification needed to be based on an assessment of *224 the individual as a whole person, that he [decedent] was the book.... But he did not say, for instance, that a combination of white blood cells at a certain rate and a certain amount of diarrhea, and a certain amount of vomiting, if that occurred, or a certain amount of mucositis would permit a doctor to conclude that... it was necessary to have a five percent reduction or a ten percent reduction or a 15 or 20 percent reduction. And in that respect, he did not provide any clinical correlation to the sliding scale that he presented for dose modification....
[H]e, likewise, did not establish any basis on which one could determine that his undefined clinical assessment and sliding scale dose modification was based either on his own experience or on the experience of practitioners with whom he had consulted. He did not testify in any respect with regard to his own patients.
And he acknowledged during voir dire that he had seen relatively few patients who had laryngeal cancer and had been treated with larynx sparing chemotherapy and radiation. He did not testify in any respect to conversations with people outside his own practice. And he testified with respect to his own practice that there was no standard among doctors that he practiced with as to what signs and symptoms would lead to the need for a particular dose modification.
On that basis, I find not only that an inadequate standard was set, but also that the standard that was utilized was not demonstrated to be one that was accepted within the medical community. Indeed, what the doctor appears to have done is some form of post-hoc analysis saying that because he died, something should have been done.
Even if I were to find the standard adequate, and if I were to find that it was sufficient under these circumstances to say that because a person has been hospitalized for four days in an era in which hospitalizations are increasingly rare, that a dose modification was required, and so long as some modification took place that no deviation would occur... I still cannot find that Dr. Villa has established a factual basis for a jury to determine that the conduct of Dr. Tavorath was a proximate cause of the death of Mr. Rosenberg.
In that regard, I would note that by concession of the plaintiff's attorney, what we're dealing with is a but for causation situation. What I have on causation is ... Dr. Villa's testimony that if the dose had been reduced [by] 25 percent, there would have been a significant reduction in toxicity, and anything less than that would have been ... risky.
He testified further that a dose reduction of ten to 15 percent would have had substantial toxicity, but he felt that it would not be ... lethal. He did not express that opinion with any great certainty and, in fact, said that there was considerable guesswork involved in stating what he did say. Giving the plaintiff the benefit of the doubt, he said in the trial testimony that that would be educated guesswork. In his deposition, he simply said that he was guessing.
There was no testimony whatsoever with respect to the consequences of a five percent reduction in the dosage of the chemotherapeutic agents utilized in this case. And for that reason, the jury would have no basis on which to conclude that ... a failure to reduce chemotherapy by five percent was a proximate cause of Mr. Rosenberg's death.
....

*225 My determination is based on the science as I see it to have been presented to me through an expert.
And ... the science was insufficient.
Pursuant to Rule 4:37-2(b), "[a]fter having completed the presentation of the evidence on all matters other than the matter of damages ... the defendant ... may move for a dismissal of the action ... on the ground that upon the facts and upon the law the plaintiff has shown no right to relief." "[S]uch motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." Ibid.
In determining a motion for an involuntary dismissal, the trial court must accept as true all the evidence which supports the plaintiff's position and must accord that party the benefit of all legitimate inferences which can be deduced therefrom; if reasonable minds could differ the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). The court is not concerned with the "worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence...." Ibid.
To establish a prima facie case of negligence in a medical malpractice action, a plaintiff usually must present expert testimony to establish the relevant standard of care, the doctor's breach of that standard, and a causal connection between the breach and the plaintiff's injuries. Estate of Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 469, 734 A.2d 778 (1999). Absent competent expert proof of these three elements, the case is not sufficient for determination by the jury. Sanzari v. Rosenfeld, 34 N.J. 128, 134-35, 167 A.2d 625 (1961); Parker v. Goldstein, 78 N.J.Super. 472, 484, 189 A.2d 441 (App.Div.) certif. denied, 40 N.J. 225, 191 A.2d 63 (1963).
The court qualified Dr. Villa as an expert in oncology following an extensive voir dire. However, in granting defendants' motion for an involuntary dismissal after Dr. Villa testified, the court determined that Dr. Villa's opinion was suspect because he acknowledged, among other items, that "he had seen relatively few patients who had laryngeal cancer and had been treated with larynx sparing chemotherapy and radiation." In reaching this conclusion, the trial judge intruded on the function of the jury to determine the credibility and probative value of the expert's testimony.
A physician has a duty to exercise in the treatment of his or her patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his or her field. Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964). In Sanzari, supra, 34 N.J. at 136, 167 A.2d 625, the Supreme Court stated that "the license to practice imports the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." While it is true that "mere possession of a license to practice medicine does not without more conclusively establish the physician's competency to testify in a malpractice case ... [h]is license to practice at least imports some general competency to testify on all medical subjects." Carbone v. Warburton, 11 N.J. 418, 424-25, 94 A.2d 680 (1953). Having graduated from Harvard Medical School in 1970, and having obtained board certifications in six subspecialties, including oncology, Dr. Villa clearly possessed the minimum training and knowledge essential to the expression of an opinion on the subject of the professional standards applicable to chemotherapy treatment sufficient to withstand a motion for involuntary dismissal.
*226 In addition to what is implied by a license to practice, Dr. Villa was qualified to offer his expert opinion on the basis of occupational experience or knowledge acquired over a period of years. Bellardini v. Krikorian, 222 N.J.Super. 457, 463, 537 A.2d 700 (App.Div.1988); Correa v. Maggiore, 196 N.J.Super. 273, 282, 482 A.2d 192 (App.Div.1984). As it is said, "[a] witness may be qualified to testify as an expert either `by study without practice or by practice without study.'" State v. Chatman, 156 N.J.Super. 35, 41, 383 A.2d 440 (App.Div.), (quoting State v. Smith, 21 N.J. 326, 334, 121 A.2d 729 (1956), certif. denied, 79 N.J. 467, 401 A.2d 224 (1978)). Although Dr. Villa treated only about six or seven patients for "head-neck" cancer, he saw sixty to seventy oncology patients in his office per week and treated oncology patients with chemotherapeutic drugs for twenty years. Plaintiff demonstrated Dr. Villa's competence to offer an opinion concerning the standard of care in treating a patient with laryngeal cancer who had experienced chemotherapy toxicity. "Any [perceived] deficiencies in his qualifications should have been left to the consideration of a jury `to determine the credibility, weight and probative value of the expert's testimony.'" James v. City of East Orange, 246 N.J.Super. 554, 563, 588 A.2d 412 (App.Div.1991) (quoting Rubanick v. Witco Chem. Corp., 242 N.J.Super. 36, 48, 576 A.2d 4 (App.Div.1990), modified on other grounds, 125 N.J. 421, 593 A.2d 733 (1991)).
In addition to determining whether a witness is qualified to testify as an expert, the trial court must also decide the closely related issue as to whether the expert's opinion is based on facts and data. Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 702 (2002). As construed by applicable case law, N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981); Nguyen v. Tama, 298 N.J.Super. 41, 48-49, 688 A.2d 1103 (App.Div.1997). Under the "net opinion" rule, an opinion lacking in such foundation and consisting of bare conclusions unsupported by factual evidence is inadmissible. Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984); Buckelew, supra, 87 N.J. at 524, 435 A.2d 1150. The rule requires an expert "to give the why and wherefore" of his or her opinion, rather than a mere conclusion. Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996).
In this regard, the trial court found:
[Villa] did not testify in any respect to conversations with people outside his own practice. And he testified with respect to his own practice that there was no standard among doctors that he practiced with as to what signs and symptoms would lead to the need for a particular dose modification.
Thus, the court concluded that "the standard that was utilized was not demonstrated to be one that was accepted within the medical community," the implication being that Dr. Villa offered a net opinion, or an opinion that was personal to him.
We disagree. Dr. Villa was competent to testify and offer an opinion regarding treatment of laryngeal cancer with chemotherapy. Accepting as true all of the evidence and legitimate inferences drawn therefrom, Dr. Villa offered adequate, particularized testimony sufficient to establish a standard of care, a deviation from that standard, and a causal link between that deviation and the injury. He had personally administered the chemotherapy drugs in question numerous times over a twenty-year *227 period. He studied and trained in oncology for nearly a decade before becoming board certified, and he served as chief of oncology at two hospitals. He was certainly familiar with the subject of his testimony and he repeatedly stated that the majority of oncologists would concur with his opinion regarding dose modification.
Throughout the trial, and on appeal, defendants repeatedly pointed to Dr. Villa's failure to cite and apply the National Cancer Institute's ("NCI") CTC grading system. The failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion. State v. Freeman, 223 N.J.Super. 92, 115-16, 538 A.2d 371 (App.Div.1988), certif. denied, 114 N.J. 525, 555 A.2d 637 (1989). Rather, such an omission merely becomes a proper "subject of exploration and cross-examination at a trial." Rubanick, supra, 242 N.J.Super. at 55, 576 A.2d 4. Given the level of Dr. Villa's competency, the trial court attributed undue significance to the physician's acknowledgment that his oncology group had not adopted a numerical grading system for rating chemotherapy toxicities.
Moreover, Dr. Villa's acknowledgment that the numerical grading system was not employed by his group was an insufficient basis, on an involuntary dismissal motion, for the trial court to conclude that "there was no standard among doctors that he practiced with." Dr. Villa provided a plausible explanation, which a jury could weigh and determine whether to accept or disregard. Dr. Villa explained that his group did not employ the CTC ratings because they were primarily used by teaching institutions, such as MSKCC, for purposes of uniform reporting of data to the NCI. He also testified at great length to the fact that standards of care in oncology do not vary from community to community, and that his oncology group adhered to the same standards of care as did the majority of oncologists throughout the nation. Rather than adopting a "number system" for grading toxicity criteria, Dr. Villa's group relied upon their "experience and knowledge" in assessing toxicities and making appropriate dose modifications.
Nor does the fact that Dr. Villa failed to cite any treatises, articles, protocols or the like in support of his opinion render it a net opinion as claimed by defendants. Evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience. Bellardini, supra, 222 N.J.Super. at 463, 537 A.2d 700. "The requirements for expert qualifications are in the disjunctive. The requisite knowledge can be based on either knowledge, training or experience." Ibid. Of course, "`the weight to which an expert opinion is entitled can rise no higher than the facts upon which the opinion is predicated.'" Ibid. (quoting Johnson, supra, 97 N.J. at 91, 477 A.2d 1246) (other citations omitted).
Among the acts and omissions of Dr. Tavorath which Dr. Villa characterized as falling below accepted standards of care, were her failure to (1) recognize the totality of the "very significant" toxicities resulting from the first cycle; (2) recognize that decedent's fever was attributable to his "severe" level of neutropenia; (3) recognize that decedent's severe mucositis left him vulnerable to bacteria; (4) appreciate the significance of decedent's weight loss, his severely depleted protein levels, and the prolonged period of dehydration and diarrhea; (5) consider the totality of the *228 foregoing toxicities in administering a second, identical dose of chemotherapy; and (6) modify the second dose despite having anticipated a re-occurrence of the severe neutropenia as evidenced by the fact that she prescribed a hormone to ameliorate the degree of anticipated neutropenia.
With respect to causation, Dr. Villa testified that an appropriate dose modification would have resulted in less toxicity, the complications would not have been to the same extent, the level of toxicity would not have been lethal, and decedent would not have died from the complications of chemotherapy. It was Dr. Villa's opinion, within a reasonable degree of medical probability, that the administration of the second cycle of chemotherapy at the identical dosage as the first cycle caused decedent's death. Further, it is undisputed that decedent in fact died from chemotherapy toxicity.
The trial court incorrectly found that Dr. Villa's testimony was insufficient to establish the standard of care, a deviation, or causation, to allow plaintiff's case to be presented to a jury, because the expert failed to correlate specific levels of toxicities with quantified dose modifications. "An expert's opinion need not be predicated on medical certainty." Greene v. Memorial Hosp. of Burlington, 304 N.J.Super. 416, 420, 701 A.2d 437 (App. Div.1997). This is particularly important in a case such as the present one where Dr. Tavorath did not reduce the dosage level at all. Even though Dr. Villa's testimony may be "fairly susceptible of divergent inferences," the court may not substitute its own judgment for that of the jury by making findings of fact based only on plaintiff's proofs, and then dismissing on the basis of adverse findings. Lanzet v. Greenberg, 126 N.J. 168, 193, 197, 594 A.2d 1309 (1991).

II.
As to the second issue, plaintiff maintains that the trial court committed reversible error in dismissing the complaint without first ruling on plaintiff's "preserved claim" that Dr. Tavorath's violation of MSKCC's protocol requiring a "team approach" constituted negligence. We agree.
Prior to plaintiff offering the deposition testimony of the physicians to the jury, defense counsel moved to dismiss the claim regarding violation of the "team approach" protocol, arguing that there was no expert testimony to support plaintiff's theory that the standard of care required Drs. Strong and Schupak to have input or that any failure to follow a "team approach" had any bearing on the issue of negligence. Plaintiff's counsel argued that under Tobia v. Cooper Hospital University Medical Center, 136 N.J. 335, 643 A.2d 1 (1994), Dr. Tavorath's violation of the hospital rule in "prevent[ing] the other two members of her team from knowledge from having the opportunity to see Mr. Rosenberg," constituted negligence. The trial court dismissed plaintiff's protocol claim "as they relate to the other doctors" because there was no evidence "to suggest that they violated any duty that they had to this particular patient." However, the court stated that it would
preserve [plaintiff's] argument that Dr. Tavorath violated a duty as established by the protocol.
....
Permitting at this stage, but only at this stage, an inference to be drawn that a different result would have occurred if the consultation had taken place. Obviously, that is an inference that [defense counsel] is free to shoot down should he choose to do so in the defense case.
*229 However, our review of the record indicates that the trial court did not specifically address this claim when she granted defendants' motion for an involuntary dismissal of plaintiff's complaint.
Plaintiff also requests that we assume original jurisdiction under Rule 2:10-5, and determine that violation of the protocol established negligence. While plaintiff concedes that her expert did not offer any testimony regarding this protocol, she maintains that expert testimony was not required because such protocol constitutes standards of care as a matter of law. We decline to rule on this issue, due to the sparsity of the record before us. We leave to plaintiff's counsel the trial strategy in presenting this claim in the context of the new trial, with the following brief comments.
The language of protocol 5.141 that "[r]esponse to chemotherapy will be determined by agreement of all three physicians involved" suggests an intent on the part of MSKCC that there be an exchange of information and facilitation of communication between specialists in a multi-disciplinary team approach in managing a cancer patient's care. Since it appears from the trial testimony, however, that protocols may be subject to divergent inferences, expert testimony may be necessary to explicate the protocols' terms and in order to understand their significance in the context of this case. See, e.g., Morlino v. Medical Ctr. of Ocean Cty., 152 N.J. 563, 578-81, 706 A.2d 721 (1998) (holding that Physicians' Desk Reference recommendations are not conclusive evidence of the standard of care or accepted practice, and are admissible on the issue of the standard of care only when they are supported by expert testimony).
For example, throughout the voir dire and cross-examination of Dr. Villa, defense counsel repeatedly suggested that the LP treatment protocol, which employs the NCI "gradings of toxicities," constituted the accepted standard of care among oncologists regarding dosages. Dr. Villa took the position that this protocol was "not written in steel" but, rather, was a guideline subject to modification by a physician depending on the patient's condition and responses. Without explanation, plaintiff appears to take an opposite position with regard to protocol 5.141. Plaintiff asserts that Dr. Tavorath's failure to consult with Drs. Strong and Schupak after each cycle of chemotherapy is a violation of the "team approach" protocol and is evidence of negligence.
Thus, in the retrial, plaintiff may need to present factual testimony from the scrivener or a promulgator of the protocols or MSKCC's administrators as to their intent in adopting the protocols, how they are monitored internally, and their interpretation of whether they constitute a mandate or a guideline may be necessary. Even were protocol 5.141 determined to reflect a standard of care, plaintiff will still have to demonstrate a causal connection between Dr. Tavorath's failure to affirmatively consult with Drs. Strong and Schupak between the first and second cycles of chemotherapy regarding Mr. Rosenberg's physical condition and his health.
Reversed and remanded for a new trial on all issues.
NOTES
[1] MSKCC states that it is incorrectly designated "Memorial Sloan-Kettering Cancer Center at Northwest Covenant Medical Center" and "Memorial Sloan-Kettering Physicians at Northwest Covenant Medical Center." The proper designation is Memorial Sloan-Kettering Cancer Center.
[2] According to counsel at oral argument, plaintiff did not amend the complaint to add Drs. Strong and Schupak as defendants.
[3] Insofar as relevant here, the treatment protocol provides:

5.14 Response to chemotherapy will be assessed prior to each cycle of chemotherapy.... If there is unequivocal evidence of disease progression ... the patient will be taken off study and standard treatment will be recommended. If after two cycles of chemotherapy there is no better than stable disease, induction chemotherapy will be discontinued and the patient will be referred directly to concurrent chemotherapy and RT. All other patients will proceed with the third cycle of chemotherapy....
5.141 Response to chemotherapy will be determined by agreement of all three physicians involved....
....
9.1 The probable or possible toxic effects of this therapy include the following:
9.11 Cisplatin: Nausea, vomiting, alopecia, myelosuppression, anorexia, auditory dysfunction, renal dysfunction, and peripheral neuropathy.
9.12-5 Fluorouracil: Nausea, vomiting, alopecia, myelosuppression, anorexia, diarrhea, stomatitus, dermatitis, neurologic dysfunction, and hyperpigmentation of veins.
....
9.2 Toxicity will be graded on a scale of 0-4 according to the Common Toxicity Scale....
9.3 Treatment will be discontinued at any time due to unacceptable or life-threatening side effects not described in any other section....
[4] Dr. Marcus' testimony was not transcribed.
[5] The testimony of decedent's daughter-in-law was deferred pending the ruling on defendants' motion for involuntary dismissal.