**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2194-22

JAMES DONOVAN and
MAUREEN BULL, his wife,

     Plaintiffs-Appellants,

v.

MARK I. MILLER, M.D.,
PREMIER UROLOGY GROUP,
LLC, THE STONE CENTER OF
NEW JERSEY, LLC, and BOSTON
SCIENTIFIC CORP.,

     Defendants-Respondents.

_____

Submitted February 12, 2024 – Decided March 12, 2024

Before Judges Mawla, Marczyk, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1021-20.

Fronzuto Law Group, attorneys for appellants (Ernest Paul Fronzuto, III, of counsel; Casey Anne Cordes, on the briefs).

Vasios, Strollo & Durán, PA, attorneys for respondents Mark I. Miller, M.D. and Premier Urology Group, LLC

(Rowena Marie Durán, of counsel and on the brief; Douglas McNeil Singleterry, on the brief).

PER CURIAM

Plaintiffs James Donovan and his wife Maureen Bull appeal from the trial court's December 12, 2022 order barring their liability expert as a net opinion and the court's February 27, 2023 order denying their cross-motion for reconsideration.[1] Plaintiff further appeals from the trial court's February 16, 2023 order granting defendants Dr. Mark Miller and Premier Urology Group LLC's motion for summary judgment.[2]

## I.

Plaintiff was a patient of Dr. Miller from approximately February 2016 to November 2018 for various urological complaints. He was eventually diagnosed with benign prosthetic hyperplasia ("BPH").[3] Following a period of

---

[1] Because plaintiff Bull's claims are derivative of Donovan's claims, we will refer to Donovan as plaintiff for ease of reference.

[2] Defendant, Boston Scientific Corp., the company that produced the device, settled. Defendant, The Stone Center of New Jersey, LLC, the facility where the procedure was performed, also settled.

[3] BPH is a condition that causes a patient's prostate to grow, which may block the patient's urethra and cause symptoms that affect a patient's ability to urinate or ejaculate. Rezum Procedure, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/rezum (Nov. 8, 2023).

conservative therapy, Dr. Miller and plaintiff discussed various treatment options including the Rezum procedure. The Rezum procedure involves the insertion of a device into a patient's urethra. Small needles are then deployed through the urethra delivering steam into the enlarged areas of the prostate. The steam is designed to destroy the prostate cells causing the enlarged areas to shrink. Rezum Procedure, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/rezum (Nov. 8, 2023).

In May 2018, plaintiff elected to undergo the Rezum procedure. Following the procedure, plaintiff reported symptoms indicative of a bladder neck contracture and obstruction of the ejaculatory ducts resulting in a loss of the ability to ejaculate. Plaintiff's damages expert Dr. Jonathan M. Vapnek opined these conditions were permanent.

In June 2020, plaintiff filed a complaint alleging medical malpractice and asserting product liability claims for the injuries allegedly caused by the Rezum procedure. At the conclusion of discovery, defendants moved to bar plaintiff's standard of care expert Dr. Michael A. Palese.

Dr. Palese has extensive education, training, and experience in the field of urology, including performing Rezum procedures. Defendants did not dispute

his qualifications to render an opinion in this matter, but rather contended he only offered net opinions in both his expert report and his deposition.

In his report, Dr. Palese concluded:

> Complications following Rezum are well known and documented. However, in [plaintiff's] case, his complications were extensive and morbid including bladder neck contracture, ejaculatory duct dysfunction, anejaculation, pelvic pain and persistent lower urinary tract symptoms. The procedure described by Dr. Miller's operative summary describes three . . . water vapor treatments for a prostate measuring [thirty-eight] grams preoperatively. Long term studies on Rezum show that patients can sustain certain complications but the progression to complete ejaculatory duct obstruction, severe bladder neck contracture[,] or anejaculation are extremely rare and beyond those that can or should be reasonably expected or anticipated. . . . If properly performed, there is no conceivable way that . . . water vapor treatments for a prostate measuring [thirty-eight] grams could or should produce the extent of damage experienced by [plaintiff]. The morbid postoperative complications experienced by [plaintiff] leaves little doubt that the technique in performing the Rezum is inconsistent with what is described in the operative report and a violation of the standard of care.

At his deposition, Dr. Palese acknowledged there are various risks associated with the Rezum procedure. Specifically, he noted the potential risks include dysuria (pain with urination), hematuria (blood in the urine), haematospermia (blood in the semen), urinary frequency, urinary retention,

4

urinary tract infection, urosepsis, and retrograde ejaculation (semen enters the bladder instead of emerging through the penis). Regarding plaintiff's bladder neck contracture (a condition in which scar tissue forms in the lower part of the bladder), Dr. Palese testified, "[i]t's a very uncommon finding and actually only one [patient] in the initial studies . . . ever developed [the condition]." As to the risks of anejaculation (a complete inability to ejaculate due to the complete obstruction of the ejaculatory duct), Dr. Palese testified that "it was never described in any of the . . . original data and I have not seen it described anywhere else until I saw this case."

Dr. Palese explained that "no one really knows exactly why" the Rezum procedure can cause retrograde ejaculation, but "the theory is" that it can occur if the "energy source[,] which is the water vapor[,] gets too close to the ejaculatory duct." He further conceded the water vapor getting too close to the ejaculatory duct can occur even if the procedure is properly performed. He also noted the bladder neck contracture can occur because injecting the water vapor into the prostate can lead to inflammation and scarring, which can also occur even when the procedure is properly executed.

During the deposition, Dr. Palese was questioned regarding how Dr. Miller deviated from accepted standards of care:

Q. Can you delineate for me what was done improperly in this procedure?

A. Well, what's described . . . by Dr. Miller in his deposition, this all appears to be routine, however, what's not routine is the outcome which is that the patient developed a severe bladder neck contracture, developed almost a complete obstruction of their ejaculatory duct, has postoperative prostatic pain, all these things are not typical for doing a Rezum properly. So that's the concern.

Q. Okay. So what is it about the procedure that was performed improperly that led to these complications[,] in your opinion?

A. Again, without being there and seeing how it was performed, it's not a typical thing to have these complications, so many complications occur at the same time. And again, [to] even have a complication that no one else has ever described is one of the issues.

Q. And that being the anejaculation?

A. That being the complete obstruction of the ejaculatory ducts post Rezum.

Q. Okay. So is that the same thing as anejaculation or that's the effect—

A. Anejaculation is the consequence of that.

Dr. Palese was further questioned about whether he could specifically identify how Dr. Miller was negligent in performing the Rezum procedure:

Q. Was there anything contained in [the operative report] that indicated that there was a deviation from

6

standards of care in [h]ow the procedure was performed?

. . . .

A. Based on what I read, no.

Q. And you obviously reviewed the deposition transcript of Dr. Miller, was there anything that you reviewed in the deposition of Dr. Miller that indicated that he deviated from standards of care in the manner in which he performed the Rezum procedure?

A. Not in the manner in which Dr. Miller described it.

Q. Okay. Was there anything in any of the records that you reviewed that indicated that there was a deviation from standards of care in the manner in which Dr. Miller performed this Rezum procedure?

. . . .

A. [W]ith what's written, no.

Q. Okay. And in the depositions you didn't see anything either, correct?

A. Same thing.

Q. Okay. So as I understand it, it is the fact that this patient has suffered from a number of complications from Rezum that leads to your opinion that there was a deviation from standards of care in the manner in which Dr. Miller performed this procedure, fair?

A. Correct.

7

Q.   Okay.   Other than that criticism as I read your report, you have no other criticisms of Dr. Miller, correct?

A.   That is correct.

The trial court conducted oral argument and rendered an oral opinion regarding defendants' motion to bar Dr. Palese based on the net opinion rule. The court noted, "[nowhere] in Dr. Palese's report does he at all discuss what was done improperly in the performance of this procedure."  The court then referenced Dr. Palese's deposition testimony wherein he conceded there was nothing in the operative report or deposition testimony of Dr. Miller to suggest Dr. Miller deviated from accepted standards of care.  Citing to Model Jury Charges (Civil), 5.50A, "Duty and Negligence" (approved Mar. 2002), the court noted that jurors should not speculate or guess about the standards of care applicable to a defendant.  "Rather, [jurors] must determine the applicable medical standards from the testimony of the expert witness."

The court continued, "[t]herefore, whether the defendant doctor was negligent, depends not on the outcome, but on whether he . . . adhered to or departed from the applicable standard of care."  The court observed it does not matter whether the risk at issue is recognized or not, and it is improper to conclude there was malpractice based on a bad outcome.  It stated, "Dr. Palese

8

did not state how the procedure was done improperly and so simply stating that there was a complication even if it is a rare complication, and even if this is the first time this has ever happened, that does not demonstrate a deviation." The court concluded that Dr. Palese's expert report and testimony was a net opinion.

On December 12, 2022, the judge entered an order barring the testimony of Dr. Palese as a net opinion. Thereafter, defendants moved for summary judgment, and plaintiff cross-moved for reconsideration of the order barring Dr. Palese from testifying.

In deciding the motions for summary judgment and reconsideration, the court noted, "Dr. Palese was simply asked . . . what Dr. Miller did and he answered honestly, that he could not say exactly" how Dr. Miller deviated from the standard of care. The court reiterated Dr. Palese could not state what the deviations were or how the injury occurred. Because Dr. Palese could not explain how Dr. Miller deviated from the standard of care and proximately caused plaintiff's injuries, the court determined there was no basis to reconsider its decision. Moreover, because plaintiff did not have a liability expert to testify at trial, the court granted summary judgment. This appeal followed.

II.

9

Plaintiff argues the trial court erred in barring Dr. Palese because he offered opinions "based upon the facts of the case."[4] He further contends the trial court erred in precluding plaintiff from utilizing the doctrine of res ipsa loquitur. Plaintiff also asserts the court erred in not granting reconsideration of the order barring Dr. Palese and that it should have conducted a Rule 104 hearing. We address these arguments in turn below.

A.

We review grants of summary judgment de novo applying the same standard as the trial court. Lee v. Brown, 232 N.J. 114, 126 (2018). Summary judgment will be granted if, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue of material fact and 'the moving party is entitled to a judgment or order as a matter of law.'" Conley v. Guerrero, 228 N.J. 339, 346 (2017) (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)); R. 4:46-2(c). "[A] trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015).

---

[4] Plaintiff emphasizes Dr. Palese's "extensive expertise and qualifications." We assume for the purposes of this appeal, as did the trial court, that Dr. Palese is a qualified expert in the field of urology. This is not disputed by defendants.

A-2194-22

Generally, in malpractice actions, an expert must identify (1) an established standard of care, (2) how the defendant allegedly deviated from that standard, and (3) that the deviation proximately caused the injury. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). See also Toy v. Rickert, 53 N.J. Super. 27, 31-32 (App. Div. 1958) (stating that except in limited circumstances not relevant to this appeal, the standard of care must be established by expert testimony). Thus, a plaintiff in a medical malpractice case "ordinarily is required to establish that the defendant's treatment or care fell below the standard established and recognized by the medical profession for the indicated condition of the patient, and the standard must be proven by expert medical testimony." Terhune v. Margaret Hague Maternity Hosp., 63 N.J. Super. 106, 111 (App. Div. 1960) (citing Toy, 53 N.J. Super. at 32). A plaintiff's failure to present an expert is fatal to their case.

The dispositive issue on defendants' summary judgment motion is whether the trial court properly barred Dr. Palese's testimony based on the net opinion rule. As such, this case turns on the sufficiency of Dr. Palese's testimony and whether it established that Dr. Miller deviated from accepted standards of care.

Two rules of evidence frame the analysis for determining the admissibility of expert testimony: N.J.R.E. 702 and N.J.R.E. 703. N.J.R.E. 702 identifies

11

when expert testimony is permissible and requires the experts to be qualified in their respective fields. There is no dispute here as to the need for an expert or the qualifications of Dr. Palese.

N.J.R.E. 703 addresses the foundation for expert testimony. Expert opinions must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)); State v. Townsend, 186 N.J. 473, 494 (2006).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend, 221 N.J. at 53-54 (alteration in original) (quoting Polzo, 196 N.J. at 583); see also Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) (holding "a trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified."). Pursuant to the net opinion rule, therefore, experts must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate

12

that both the factual bases and the methodology are reliable." Townsend, 221 N.J. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

Stated another way, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). Thus, "[t]he net opinion rule is succinctly defined as 'a prohibition against speculative testimony.'" Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). This is because a speculating expert "ceases to be an aid to the trier of fact and becomes nothing more than an additional juror," Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), affording no benefit to the fact finder. See N.J.R.E. 702. "The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend, 221 N.J. at 52.

With these principles in view, we turn to the testimony of Dr. Palese. Plaintiff argues the trial court erred in barring Dr. Palese's testimony based on the net opinion rule, relying on Rosenberg v. Tavorath, 352 N.J. Super. 385 (App. Div. 2002). Rosenberg involves a medical negligence action where it was alleged the defendant deviated from accepted standards of practice by "failing to reduce the dosage of [medication for] the second round of chemotherapy,"

leading to the decedent's death. Id. at 395. The plaintiff's expert testified that the defendant "failed to recognize that the significant toxicity suffered by [the] decedent following the first cycle of chemotherapy warranted a dose modification for the second cycle." Ibid. Specifically, the expert opined "a dose modification of about [ten percent] to [twenty-five percent] would have avoided or lessened the severity" of the decedent's complications. Ibid. The expert also indicated on cross-examination that if the defendant had decreased the dosage by even five percent, he would not have criticized the defendant, even if the decedent had died. Id. at 396. However, the expert conceded he could not give what precise dose modification was required. Ibid. On cross-examination, the expert stated his testimony "was not to establish the exact dosage" but rather to demonstrate that a change in dosage should have been administered. Ibid.

The trial court granted the defendant's motion for a directed verdict. Id. at 394. The trial court determined the expert did not provide a "precise quantification" as to the modification necessary in the second round of chemotherapy. Id. at 397. We reversed, noting the expert articulated a variety of areas where the defendant had deviated from accepted standards of care, including failing to recognize the significant toxicity suffered by the plaintiff after the first round of chemotherapy, appreciating the significance of the

14

decedent's weight loss, and failing to modify the doses for the second round of chemotherapy.  Id. at 401-03.  We further observed the plaintiff's expert "testified that an appropriate dose modification would have resulted in less toxicity," and that the "administration of the second cycle of chemotherapy at the identical dosage" was inappropriate.  Id. at 404.  We concluded that even though the expert's testimony may be "susceptible of divergent inferences," the trial court should not have substituted its own judgment for the jury.  Ibid. (quoting Lanzet v. Greenberg, 126 N.J. 168, 193 (1991)).

Plaintiff's reliance on Rosenberg is misplaced.  The facts in Rosenberg are far afield from the facts before us in this matter.  The expert in Rosenberg, though equivocating with respect to the precise dose modification needed for the purposes of the second cycle of chemotherapy, clearly identified how the defendant deviated from accepted standards of practice in treating the plaintiff. Id. at 403-04.  Here, Dr. Palese has not offered such an opinion.  Rather, his opinion is based on the fact that there was a poor outcome as opposed to specifically identifying how Dr. Miller deviated from accepted standards of care.

Indeed, plaintiff concedes, "Dr. Palese cannot exactly specify what Dr. Miller did wrong during the Rezum procedure or how many water vapor

15

treatments caused [plaintiff's] injuries." Dr. Palese opined in his report that if Dr. Miller performed the procedure properly, there was "no conceivable way" the water vapor treatments "could or should produce the extent of damage experienced by [plaintiff]." Absent from the report, however, is any discussion of how the surgery was performed and how the execution of the surgery deviated from accepted standards of care. In fact, Dr. Palese conceded at his deposition he could not specifically articulate what was done improperly.

Plaintiff suggests that because Dr. Palese was not in the operating room, it would be "impossible" to state what Dr. Miller did improperly. However, we agree with defendants that surgical malpractice cases are routinely tried in similar circumstances, and the experts are never present during the underlying procedure but nevertheless offer opinions based on their training and experience as to how a surgeon deviated from accepted standards of care. Dr. Palese was unable to do so in this case, rendering his testimony a net opinion. It would be unfair to Dr. Miller to attempt to defend a case when it is not clear how he is alleged to have negligently performed the procedure.

We further agree with the trial court that Dr. Palese's testimony would require the jury to speculate as to how Dr. Miller was negligent in performing the Rezum procedure. We are satisfied the trial court correctly barred Dr. Palese

16

as he failed to give the "why and wherefore" regarding the alleged deviation. Plaintiff acknowledges that "Dr. Palese cannot speculate as to what exactly Dr. Miller did wrong." An untoward result does not necessarily establish that a defendant deviated from accepted standards of care. There is simply insufficient proof by way of expert testimony to establish Dr. Miller was negligent in this case, and it would be inappropriate to have the jury engage in conjecture as to how defendant was negligent. In Rosenberg, we held the expert "offered adequate, particularized testimony sufficient to establish a standard of care, a deviation from that standard, and a causal link between that deviation and the injury." Id. at 402. That is not the case with the opinions offered by Dr. Palese. Accordingly, the court correctly barred his testimony and granted summary judgment.

## B.

Plaintiff next argues the court should have applied the doctrine of res ipsa loquitur. He contends Dr. Palese's testimony established plaintiff's complications do not occur in the absence of negligence. Plaintiff relies on Buckelew v. Grossbard, where the Supreme Court determined a "fair reading" of the plaintiff's expert testimony that "it is common knowledge within the medical community that the type of accident that took place . . . [(a mistaken

incision into plaintiff's bladder)] does not ordinarily occur in the absence of the surgeon's negligence." 87 N.J. 512, 528 (1981). Plaintiff asserts Dr. Palese's opinion is similar to the opinion offered by the expert in Buckelew.

The res ipsa loquitor doctrine permits an inference of negligence establishing a prima facie case of negligence. Jerista v. Murray, 185 N.J. 175, 191-92 (2005). To invoke the doctrine, a plaintiff must establish that "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." Szalontai v. Yazbo's Sports Cafe, 183 N.J. 386, 398 (2005) (alteration in original) (quoting Brown v. Racquet Club of Bricktown, 95 N.J. 280, 288 (1984)).

In Buckelew, the Supreme Court noted that res ipsa loquitur could be applicable in medical malpractice cases. 87 N.J. at 527. Specifically, the court noted, "[r]es ipsa loquitur is grounded in probability and the sound procedural policy of placing the duty of producing evidence on the party who has superior knowledge or opportunity for explanation of the causative circumstances." Id. at 526.

In Smallwood v. Mitchell, we noted, "[e]xpert testimony is required in a medical malpractice case by way of satisfying the first element of the doctrine that 'the occurrence itself ordinarily bespeaks negligence.'" 264 N.J. Super. 296, 297 (App. Div. 1993). We further observed, "[i]n Buckelew, the Supreme Court recognized that in a medical malpractice case common knowledge within the medical community was as valid a basis for an inference of negligence with respect to medical procedures as was common knowledge in the wider community concerning day-to-day occurrences." Ibid. Notably, we further stated, "[t]he decision in Buckelew was not an invitation to a broader use of res ipsa loquitur in medical malpractice cases than occurs in ordinary negligence matters." Id. at 298. "Res ipsa loquitur is a doctrine fashioned for limited application in special situations." Ibid. Significantly, we further concluded, "[i]t is not meant to be applied in every situation in which a medical procedure has an untoward result with an unknown cause." Ibid. Rather, expert testimony can satisfy the first element of the doctrine when the "medical community recognizes that an event does not ordinarily occur in the absence of negligence." Ibid. (quoting Buckelew, 87 N.J. at 527).

Smallwood involved a plaintiff suffering a sciatic nerve injury during a hip replacement surgery. Id. at 297. We noted the expert there did not satisfy

the first element of the res ipsa loquitur doctrine because he only offered his opinion that the result does not occur unless the surgeon was negligent, as opposed to offering an opinion that the "medical community" recognizes that such a result does not occur in the absence of negligence. Id. at 298. Here, Dr. Palese did not indicate the medical community at large recognizes the result in this case does not occur in the absence of negligence. Moreover, as we noted in Smallwood, res ipsa loquitur is "not meant to be applied in every situation in which a medical procedure has an untoward result with an unknown cause." Ibid. Dr. Palese did not offer any opinion regarding the precise cause of the injury—anejaculation—and only offered a theory as to the cause of retrograde ejaculation.

Unlike Buckelew, Dr. Palese's testimony cannot be construed to establish it is "common knowledge within the medical community" that this type of incident only occurs in the absence of a surgeon's negligence. 87 N.J. at 528. Dr. Palese never saw this complication nor was he able to state how it occurred. He also did not offer testimony that the medical community recognizes the injury sustained by plaintiff does not ordinarily occur in the absence of negligence. In fact he observed this was the only case he was aware of involving anejaculation.

Plaintiff's reliance on <u>Estate of Chin v. St. Barnabas Medical Center</u>, 160 N.J. 454, 459-60 (1999), is also misplaced because it was undisputed in that case the plaintiff was injured as a result of negligence, but it was unclear as to who in particular was at fault. Given that Dr. Palese himself does not know what went wrong or how the injury occurred, it does not follow this incident bespeaks negligence. In short, we conclude the trial court correctly determined res ipsa loquitur was not applicable in this case.

C.

Lastly, plaintiff contends the court should have conducted a hearing pursuant to N.J.R.E. 104(a) prior to ruling on plaintiff's motion to bar Dr. Palese. He asserts, "to the extent that the [c]ourt had concerns regarding the opinions of Dr. Palese," it should have considered a Rule 104 hearing to assess whether his opinions were based on scientifically sound reasoning.

Generally, when an opposing expert files a report, nothing requires a party to depose the expert before moving to preclude the expert's testimony. If the non-moving party believes the record is incomplete or inadequate, they can raise that issue and propose appropriate procedures such as a deposition or hearing. Here, Dr. Palese was deposed. While Rule 104 hearings can be helpful when the reliability of an expert is challenged, such a hearing is not always required.

21

See Kemp ex rel. Wright v. State, 174 N.J. 412, 432-33 (2002) (explaining that the "sounder practice" is to hold a hearing particularly when there is a challenge on the scientific reliability of an expert's opinion, but also noting that "the need for a hearing is remitted to the trial court's discretion").

Here, the record was sufficient to support the preclusion of plaintiff's medical expert without a Rule 104 hearing. Moreover, plaintiff did not request a Rule 104 hearing when defendants moved to bar Dr. Palese. It was only after the court barred Dr. Palese that plaintiff raised this issue in his motion for reconsideration. We recognize in certain circumstances a Rule 104 hearing can be useful in addressing a motion to bar an expert from testifying. Here, however, Dr. Palese was deposed and had an opportunity to articulate his opinions.

This was not a situation where the deposition did not provide Dr. Palese an opportunity to explain his opinions. The trial court was satisfied there was sufficient information in the record to render a decision on the motion to bar Dr. Palese. The court not only referenced Dr. Palese's report, but also specific portions of his deposition testimony discussing the standard of care issues. Again, plaintiff acknowledged Dr. Palese could not specify "what exactly went wrong" during the Rezum procedure, and there is no argument that a Rule 104 hearing would have changed Dr. Palese's deposition testimony. We conclude

22

the court did not misapply its discretion in not conducting a Rule 104 hearing, and we discern no basis to disturb the court's decision.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2194-22