**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1852-18T4

SITE ENTERPRISES, INC.,

    Plaintiff-Respondent,

v.

NRG REMA, LLC, and BTU
SOLUTIONS GROUP, INC.,

    Defendants-Appellants.

_____

Argued September 29, 2020 – Decided October 8, 2020

Before Judges Fasciale, Mayer, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5651-14.

Thomas J. O'Leary argued the cause for appellants (Walsh, Pizzi, O'Reilly, Falanga, LLP, attorneys; Thomas J. O'Leary, of counsel and on the briefs; Katherine M. Romano, on the briefs).

Mitchell Malzberg argued the cause for respondent (Mitchell J. Malzberg, LLC, attorneys; Mitchell Malzberg and Jodelyn S. Malzberg, on the brief).

PER CURIAM

This appeal pertains to an action for enforcement of a construction lien. BTU Solutions Group, LLC (BTU), and NGR Rema LLC (NGR) (collectively defendants) appeal from three written orders entered after a bench trial: an August 16, 2018 "opinion and order" entering judgment to the lienholder, plaintiff Site Enterprises, Inc. (SEI); a September 28, 2018 order determining that SEI is entitled to attorney fees and costs under N.J.S.A. 2A:44A-15(b), subject to a certification of services; and a November 21, 2018 order awarding those fees and costs. Defendants also challenge a "verbal order" by the judge denying their motion to bar SEI's expert, Robert Peña. Judge Arthur Bergman conducted the bench trial, entered the orders, and rendered written and oral opinions.

A trial court's factual findings "are binding on appeal if they are supported by 'adequate, substantial and credible evidence.'" Diamond Beach, LLC v. March Assocs., Inc., 457 N.J. Super. 265, 281-82 (App. Div. 2018) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). See State v. Locurto, 157 N.J. 463, 474 (1999) (explaining that credibility findings are "often

influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record"). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" and warrant de novo review. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Applying these well-settled standards and other applicable law, we affirm SEI's final judgment of $491,379.42, the award of counsel fees and costs totaling $80,188.26, and the judge's evidentiary rulings.

I.

Pertinent background information concerning the relationships between the parties and the long history of this demolition project was explained in NRG REMA LLC v. Creative Environmental Solutions Corp., 454 N.J. Super. 578 (App. Div.), certif. denied, 235 N.J. 111 (2018), a related appeal pertaining to the value of the lien fund for SEI and another BTU subcontractor, Creative Environmental Solutions Corporation.[1]

On April 5, 2012, NRG and Werner entered into a contract for demolition of Units 1, 2, and 3 of the Werner Generating Station in South Amboy. Werner

---

[1] Creative Environmental Solutions Corporation is not a party in this appeal.

paid NRG $250,000 for title to the salvage materials that it anticipated recovering during the demolition. Werner immediately received title to the salvage that it valued at $13 million. Just four days after it executed the prime contract with NRG, Werner subcontracted with BTU and "BTU stepped into Werner's shoes to perform the prime contract" for the demolition. NRG REMA LLC, 454 N.J. Super. at 584.

"BTU initially projected that costs of roughly $4.5 million would generate $13 million in salvage-related revenue." Ibid. However, "BTU overestimated the amount of salvageable metal and equipment, and underestimated the cost of recovery." Ibid. When Superstorm Sandy hit New Jersey in October 2012, "[t]he site filled with salt water, destroying otherwise salvageable equipment, dispersing asbestos throughout the site, and further complicating remediation." Ibid. Several months later, on April 25, 2013, BTU subcontracted with SEI "which agreed to perform demolition work after the storm in return for $3.7 million." Id. at 584-85.

According to the contract between BTU and SEI, titled "General Services Agreement," SEI "is in the business of providing Demolition, Asbestos Remediation, HAZMAT removal and site cleanup." The parties each agreed to designate a project manager to coordinate performance of the work, which was

4

to be completed in six months "under a fixed fee engagement" for $3.7 million, as noted above. BTU designated Helio Guzman as project manager and SEI designated Tom Rock. The scope of the work to be performed by SEI for remediation and demolition of the power generating station is described in the Statement of Work attached to the contract.

Schedule 2 of the Statement of Work lists SEI's responsibilities as follows: (1) removal/disposal of universal waste from the building; (2) set up and maintenance of silt fence around the property; (3) plating of canals for demolition work/installation of steel plates for water intake inlets on West side; (4) electrical work, including disconnecting power from the building; (5) power panel for misting blowers to be maintained on site to contain airborne dust; (6) set up power in salvage process area; (7) provide power source for and relocation of NRG cables and data lines; (8) provide additional power panel for work area; (9) complete demolition of existing power plant; (10) demolition of oil tanks, water tower, and small buildings around the plant; (11) demolition and abatement labor, with all demolition laborers having asbestos licenses plus asbestos and lead awareness training and proper personal protective equipment (PPE); (12) separating metal and non-ferrous material for salvage; (13) cutting of steel to fit into dump trailers; and (14) removal of all concrete, slabs, footing,

5

and foundations to grade. Pursuant to Schedule 2, SEI was also responsible for the disposal costs of the first 1,000 tons of asbestos-containing material (ACM).

In addition to the tasks specified in Schedule 2, Schedule 6 required SEI to supply safety information and documentation to BTU. Schedule 7 required SEI's project manager or site supervisor to attend various daily and weekly meetings and to participate in project conference calls. While Section 5 of the contract contained boilerplate language pertaining to the submission of invoices to BTU "for services not compensated on a fixed price basis," Schedule 9 of the Statement of Work made it clear that SEI was to be paid a lump sum of $3.7 million for "all work performed." The Statement of Work itself did not require SEI to submit any invoices or timesheets to BTU.

On August 29, 2014, SEI sued defendants for enforcement of a $450,000 construction lien pursuant to the CLL. The complaint also asserted breach of contract and account stated claims, not part of this appeal, that were dismissed because the parties' contract required SEI to prosecute those claims in Texas. Defendants filed a counterclaim to discharge SEI's lien, alleging that it was untimely filed and willfully overstated in violation of the CLL. They also sought attorney's fees and costs.

On April 10, 2017, defendants filed a motion in limine to preclude SEI's expert, Robert Peña, from testifying at the bench trial. Peña opined that SEI had completed at least 15% of the required work, valued at $555,000, under its lump sum contract with BTU before it demobilized from the project in December 2013. The judge denied defendants' motion in limine on the record without entering a written order. It found that Peña was qualified to give an expert opinion based upon over twenty years of experience with estimating and project management for demolition projects, and that Peña's opinion was not a net opinion because he provided the "why and wherefore" to support his conclusion. The case proceeded to trial.

The four-day bench trial was limited in scope to the timeliness of the lien and whether its value was willfully overstated.[2] SEI called four witnesses at trial: (1) James DiNatale, owner of SEI; (2) Helio Guzman, BTU project

---

[2] The parties stipulated that the amount of the lien fund as determined by the Appellate Division in NRG REMA LLC v. Creative Environmental Solutions Corp., 454 N.J. Super. 578 (App. Div.), certif. denied, 235 N.J. 111 (2018), a related case tried in 2013, was sufficient to satisfy SEI's lien claim. See L & W Supply Corp. v. DeSilva, 429 N.J. Super. 179, 184 (App. Div. 2012) (explaining that the CLL "limits the lien to the amount available in the 'lien fund,' which 'shall not exceed the unpaid portion of the contract price of the claimant's contract for the work, services, material or equipment provided'") (quoting N.J.S.A. 2A:44A-9(a)).

manager; (3) Tom Rock, SEI project manager; and (4) Robert Peña, expert in demolition cost analysis. Defendants called three witnesses: (1) Nicholas Kemper, Consolidated Asset Management Services; (CAMS) project manager;[3] (2) Jared Rossi, Chief Financial Officer of BTU; and (3) Barry Brower, expert in construction cost analysis.

The judge issued his written findings of fact and conclusions of law, concluding that SEI proved, by a preponderance of the evidence, that the lien was timely filed. The judge further determined that SEI was entitled to judgment in the amount of $450,000 plus prejudgment interest and costs. He then entered judgment for SEI in the amount of $491,379.42, dismissed defendants' counterclaim with prejudice, and awarded SEI $75,978 in attorney's fees and $4,210.26 in costs under N.J.S.A. 2A:44A-15(b), for a total of $80,188.26.

II.

On appeal, defendants argue primarily the judge's factual findings were unsupported by the credible evidence adduced at trial. They also contend that the judge erred as a matter of law when he concluded the lien was timely filed. Defendants assert that the judge abused his discretion by awarding counsel fees and costs.

---

[3] Werner is a wholly owned subsidiary of CAMS.

III.

Enacted in 1994, the CLL is a remedial statute that "replaced the longstanding Mechanic's Lien Law in New Jersey, making it easier for contractors, subcontractors and suppliers to place construction liens on property in the amount of the work, services or material they have provided, and for which they have not been paid."  Thomas Grp., Inc. v. Wharton Senior Citizen Hous., Inc., 163 N.J. 507, 509, 517 (2000).  "Work" is statutorily defined as "any activity, including, but not limited to, labor, performed in connection with the improvement of real property."  N.J.S.A. 2A:44A-2.

N.J.S.A. 2A:44A-3 provides:

> that any contractor or subcontractor . . . who provides work, services, material or equipment pursuant to a contract shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based on the contract price.
>
> [Thomas Grp., 163 N.J. at 513.]

"The lien attaches to the interest of the owner in the real property."  Ibid. (citing N.J.S.A. 2A:44A-3).  "The amount of a lien claim shall not exceed the unpaid portion of the contract price of the claimant's contract for the work, services, material or equipment provided."  N.J.S.A. 2A:44A-9.

The CLL requires claimants to file lien claims "within 90 days from the last date of work, services, material or equipment provided for which payment is claimed." Thomas Grp., 163 N.J. at 513 (citing N.J.S.A. 2A:44A-6). Enforcement actions must be initiated in Superior Court "within one year from the date the last work was provided" or the lien will be discharged. Id. at 514 (citing N.J.S.A. 2A:44A-14(a)(1)). If a lien claim is untimely or "willfully overstated . . . the claimant shall forfeit all claimed lien rights and rights to file subsequent lien claims to the extent of the face amount claimed in the lien claim." N.J.S.A. 2A:44A-15(a).

Additionally, the CLL contains a fee-shifting provision. N.J.S.A. 2A:44A-15(a) provides that if the lien claim is untimely or willfully overstated, the claimant "shall . . . be liable for all court costs, and reasonable legal expenses, including, but not limited to, attorneys' fees, incurred by the owner" in defending the lien claim. Conversely, N.J.S.A. 2A:44A-15(b) provides:

> If a defense to a lien claim is without basis, the party maintaining the defense shall be liable for all court costs, and reasonable legal expenses, including, but not limited to, attorneys' fees, incurred by any of the parties adversely affected by the defense to the lien claim. The court shall, in addition, enter judgment against the party maintaining this defense for damages to any of the parties adversely affected thereby.

For purposes of this analysis, "without basis" is defined as "frivolous, false, unsupported by a contract, or made with malice or bad faith or for any improper purpose." N.J.S.A. 2A:44A-15(d).

## IV.

We begin by addressing defendants' contention that the judge's findings are unsupported by the record. Defendants contend that evidence does not support the judge's findings that SEI completed at least 15 percent of the work contemplated under the contract and that the value of the work was $450,000. Contrary to these assertions, there is ample support in the record for the judge's findings of fact.

### A. Whether SEI completed at least 15 percent of the work

Defendants attack Peña's testimony, which the judge found to be credible, on the basis that he was unqualified to testify as an expert under N.J.R.E. 702 and because his opinion was a net opinion. Here, the judge addressed these arguments when he denied defendants' motion in limine to exclude Peña's testimony. He did so by applying applicable law and by not abusing his discretion.

A trial court's decision to admit or exclude expert testimony in a civil case is reviewed under "a pure abuse of discretion standard." In re Accutane Litig.,

234 N.J. 340, 391-92 (2018) (citing Townsend v. Pierre, 221 N.J. 36, 52-53 (2015)). "Accordingly, the trial court's decision here should not be disturbed on appeal unless the decision was 'made without a rational explication, inexplicably departed from established practices, or rested on an impermissible basis.'" Estate of Kotsovska v. Liebman, 221 N.J. 568, 588 (2015) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

"New Jersey Rules of Evidence 702 and 703 control the admission of expert testimony." In re Accutane, 234 N.J. at 348. Pursuant to N.J.R.E. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Ibid. (quoting N.J.R.E. 703). "N.J.R.E. 703 addresses the foundation for expert testimony." Townsend, 221 N.J. at 53. Expert opinions must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Ibid. (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)).

A-1852-18T4

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alterations in original) (quoting Polzo, 196 N.J. at 583). In other words, the expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). "Evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience." Rosenberg v. Tavorath, 352 N.J. Super. 385, 403 (App. Div. 2002).

The record supports the judge's finding that Peña possessed ample knowledge, experience, training and education to testify as an expert in the field of demolition cost analysis. Peña has worked exclusively for demolition companies as an estimator/project manager for almost twenty-five years. He has a bachelor's degree in civil engineering technology, and his undergraduate coursework included estimation classes. He testified at length about his work on numerous large demolition projects and his experience estimating percentage completion while the jobs are underway.

Contrary to defendants' contention, the fact that Peña had never been asked to determine "the percentage completion of a contractor's work after a contractor abandoned a Project prior to completing its work," where no schedule of values existed in the contract, does not mean he was unqualified to do so here. His extensive experience in the demolition industry is just as relevant to the unique facts at issue here. Moreover, defendants' reliance on Goldman v. Shapiro, 16 N.J. Super. 324 (App. Div. 1951), and Zulla Steel, Inc. v. A & M Gregos, Inc., 174 N.J. Super. 124 (App. Div. 1980), both decided before the CLL was enacted, is misplaced. Neither case involved a construction lien claim and neither case addressed the admissibility of expert testimony.

And Peña's opinion on the percentage completion of SEI's work did not amount to a net opinion. As the judge found, Peña explained the basis for his opinion and expressed that it was firmly grounded in his experience as an estimator in the area of demolition and his familiarity with the job site. He reviewed, among other documents, the contract between SEI and BTU in evidence, and deposition testimony from DiNatale about the work SEI had completed. He explained the methodology he used to arrive at his conclusion that SEI had completed 15 percent of the work. Specifically, he reviewed the

total scope of work as defined by the contract and compared it to the actual work that SEI completed between April 2013 and December 2013.

Defendants further claim that Peña "failed to offer any objective basis justifying his decision to assign 5 [percent] of the SEI/BTU contract value to mobilization." However, Peña testified that, in his experience, mobilization costs for demolition contracts are typically billed at the beginning of the project, with the exact number negotiated between contractor and owner, and that they could be valued as low as 3 percent or as high as 10 percent. He explained that mobilization includes moving equipment to the site, submitting plans, paying permit fees, buying materials, addressing soil erosion, and hiring electricians, among other tasks. His experience in the field provided a sound basis for his opinion. Rosenberg, 352 N.J. Super. at 403. See State v. Townsend, 186 N.J. 473, 495 (2006) (holding that an expert's "education, training, and most importantly, her experience, provided a sound foundation for her opinion" which was "not a net opinion").

In addition, we reject defendants' assertion that Peña's opinion is inadmissible because he did not consider SEI's actual costs. "An expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'"

15

Townsend, 221 N.J. at 54 (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). Peña testified repeatedly that he did not find SEI's actual costs to be relevant to a percentage completion analysis for a lump sum contract, and the court ultimately agreed. "The expert's failure 'to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'" Ibid. (quoting Rosenberg, 352 N.J. Super. at 402).

Because Peña was qualified to testify as an expert in demolition cost analysis and offered sufficient reasons to support his findings and conclusions, his opinion was not a net opinion and the court did not abuse its discretion by allowing him to testify. Moreover, the court's finding that SEI completed at least 15 percent of the work is further supported by the credible testimony of DiNatale, Rock, and Guzman about their firsthand observations of the work that SEI completed, as well as Guzman's daily project status reports which state that SEI completed 16 percent of the work under the contract as of December 2013. The court's credibility determinations are entitled to deference on appeal. Cesare, 154 N.J. at 412.

### B. Whether the lien amount was overstated

There exists support in the record for the judge's finding that the value of the work performed by SEI was $450,000. Defendants criticize Guzman's daily reports, upon which the court relied, as "inaccurate," of "little probative worth," and "not conclusive with respect to any claim by SEI against BTU" even though Guzman was BTU's project manager for the Werner project. There are multiple problems with these assertions.

First, defendants claim that Guzman failed to testify about the methodology he used to determine percentage completion when he authored the daily reports. However, this contention is belied by the record. Guzman credibly testified that, as project manager, he personally monitored and observed SEI on site each day and often discussed the day's tasks with SEI representatives. He explained that he discussed the percentage completion figures with Carroll, the project manager for CAMS, and that they looked at each task completed to arrive at the percentages. We defer to the judge's finding that Guzman testified credibly. See Cesare, 154 N.J. at 412.

Second, defendants claim that Guzman's percentage completion figures were inaccurate because, as of May 15, 2013, he determined that SEI had completed 16 percent of the work, valued at $592,000, but "SEI issued an

invoice in the amount of $150,000 for work performed through May 24, 2013." The judge found, however, that the invoices were not particularly relevant to the lien claim or the percentage completion of work by SEI because the parties' lump sum contract did not require SEI to maintain cost records.

As the factfinder in this case, the judge was permitted to assign greater evidentiary weight to Guzman's daily project status reports and related testimony and less weight to the invoices. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995) (discussing the "weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence"). Moreover, DiNatale credibly testified that the invoices were only issued pursuant to Carroll's request, and the fact that SEI sought $150,000 from BTU in May 2013 is consistent with DiNatale's credible testimony that he had negotiated a $150,000 payment with BTU for mobilization costs in May 2013. Furthermore, Guzman testified that he did not make monetary valuations of each task. In short, Guzman's percentage completion calculations need not be reconciled with the invoices as his calculations have nothing to do with SEI's costs.

Third, defendants claim that Guzman's assessment of percentage completion cannot be reconciled with BTU's records pertaining to scrap material

removed from the site between April 2013 and December 2013. But Peña credibly testified that the amount of scrap material removed from the site while SEI was working is a poor indicator of the work completed because many of SEI's contractual tasks, including asbestos abatement, site maintenance, demolition of smaller structures, and attendance at meetings, did not generate any salvageable scrap material. Because there is little to no correlation between the amount of scrap material removed and the tasks that SEI completed, defendants' data pertaining to the amount of scrap removed from the site does not contradict or undermine Guzman's assessment of percentage completion.

Contrary to defendants' assertions, Guzman's daily project status reports and his testimony thereto constituted adequate, substantial, credible evidence that supported the court's finding that the value of the work SEI performed was $450,000. Other credible evidence also supported the court's finding, including testimony from DiNatale and Rock about the tasks SEI performed through December 2013 and Peña's expert opinion that SEI completed 15 percent of the work under the contract as of December 2013. Notably, 15 percent of $3.7 million is $555,000, and SEI sought only $450,000 in its lien claim.

We reject defendants' argument that SEI's lien was "willfully overstated" pursuant to N.J.S.A. 2A:44A-15(a). "[A] willful overstatement connotes an

intent to recover that to which the claimant knows he is not entitled; in other words, a claim made in bad faith." Legge Indus. v. Joseph Kushner Hebrew Acad./JKHA, 333 N.J. Super. 537, 561 (App. Div. 2000). Defendants failed to present any evidence of bad faith and SEI's lien claim is supported by both the trial testimony and the documents in evidence. Cf. Patock Constr. Co. v. GVK Enters., LLC, 372 N.J. Super. 380, 388 (App. Div. 2004) (holding that lien was willfully overstated where the amount of the lien was neither supported by witness testimony nor trial exhibits). Defendants' discussion of Zulla Steel and Goldman is once again inapt because both were decided before the CLL and do not involve construction lien claims.

Lastly, defendants contend that the only competent evidence of the value of the work performed by SEI is Brower's expert opinion that the reasonable value of the work was $169,000—despite the fact that the court rejected Brower's opinion in its entirety. As the trier of fact in a non-jury trial, the trial judge is empowered "to accept or reject, in whole or in part, the testimony of one expert over that of another." Maudsley v. State, 357 N.J. Super. 560, 586 (App. Div. 2003). See also LaBracio Family P'Ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001) (indicating that "the weight to be given to the evidence of experts is within the competence of the fact-finder").

Here, the judge acted well within his authority when he considered and soundly rejected Brower's opinion because he used a cost analysis that was "not relevant to the contract at hand" and had not "performed an analysis of the responsibilities of SEI pursuant to the contract." Moreover, its determination that SEI's costs are not relevant to the amount of the lien is supported by the CLL's plain language which states that the claimant "shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price[.]" N.J.S.A. 2A:44A-3.

V.

Defendants contend incorrectly that SEI's lien was untimely filed and therefore invalid under N.J.S.A. 2A:44A-15(a). The judge concluded that SEI's lien, filed on December 26, 2013, was timely. Specifically, the court found that it was "undisputed" that SEI's work "began in April, 2013 and continued until demobilization occurred in December, thus making the lien filing timely." But defendants argue there is no evidential support in the record for these conclusions.

The CLL requires claimants to file lien claims "within 90 days from the last date of work, services, material or equipment provided for which payment

21

is claimed." Thomas Grp., 163 N.J. at 513 (citing N.J.S.A. 2A:44A-6(a)). "Work" is broadly defined under the CLL as "any activity, including, but not limited to, labor, performed in connection with the improvement of real property." N.J.S.A. 2A:44A-2.

Defendants once again rely on the invoices that SEI prepared for Carroll and assert that because SEI did not issue any invoices for labor after July 24, 2013, it neither completed nor sought payment for any work beyond that date and thus the lien was untimely filed. This contention is belied by the credible testimony of DiNatale, Rock, Guzman, and Peña, who each testified that SEI's work on the project continued through December 2013. That work included canal plating, as shown in a photograph dated September 30, 2013;[4] cable tray work; ongoing daily asbestos-related maintenance activities; maintenance of the silt fence to address soil erosion; participating in project meetings and phone calls concerning, among other topics, Guzman's daily project status reports and

---

[4] Contrary to defendants' assertion, the fact that SEI removed the canal plates when it demobilized does not negate the fact their installation, which was required under the contract to prevent ACM from entering the water, constituted work under the CLL. Their reliance on a 1939 Missouri case, Tallman Co. v. Villmer, 133 S.W.2d 1085, 1086 (Mo. Ct. App. 1939) is misplaced as Tallman, involved a mechanic's lien claim for a hot water heater that was brought to a premises and never installed. Tallman is factually distinguishable and not controlling.

EPA approval for the open demolition permit; and submission of safety-related documentation to BTU. Additionally, DiNatale received project-related emails in October and December 2013 that corroborate the testimony.

The Statement of Work appended to the contract required SEI to complete the activities as part of the project for demolition and abatement of the Werner generating station, and they each qualify as work under the statute. The broad definition of work codified at N.J.S.A. 2A:44A-2 is not limited to labor. Moreover, the lack of invoices for August, September, October, and November 2013 does not undermine the credible witness testimony upon which the court relied. DiNatale testified that Carroll had not requested invoices for August through November 2013 and, as the court found, SEI was not required to send BTU any invoices under the terms of the lump sum contract.

Despite the lack of invoices, the record shows that SEI sought payment for its work from BTU. DiNatale credibly testified that he asked Rossi for $450,000 to begin demolition of the main power plant building in early December 2013, before the lien was filed. DiNatale's testimony in this regard was corroborated by Rossi's testimony and by text messages between the two. Although SEI generated several invoices dated December 2013 that sought $450,000, it is not known from the record whether any of those invoices were

received by BTU prior to the filing of the lien. Nonetheless, neither the CLL nor the parties' contract require invoices to be issued when seeking payment and the testimony and text messages constituted adequate, substantial, credible evidence to support the court's ruling.

Defendants further claim that even assuming SEI maintained a presence on site and performed asbestos-related housekeeping tasks in the Fall of 2013 "while the project was delayed," those tasks do not qualify as work under the CLL—entitling SEI to a lien—and therefore the lien was untimely filed. This somewhat confusing claim appears to be grounded in defendants' characterization of SEI's lien claim as a delay damages claim. They assert that because demolition of the main building was delayed, and because both the prime contract between NRG and Werner and the subcontract between Werner and BTU contained "no-damage-for-delay" clauses,[5] SEI was not entitled to any recovery for its asbestos-related housekeeping tasks done during the "delay and disruption" of the project.

---

[5] Those clauses, which did not appear in SEI's contract with BTU, state that "neither party shall be liable for any loss or damage for delay or for nonperformance due to causes not reasonably within its control, including . . . unusual or extraordinary delays in issuance of permits by Governmental Authorities."

But this is an action for enforcement of a construction lien. Nothing in the record supports defendants' characterization of SEI's lien claim as a claim for delay damages, and SEI asserted no such claim in its complaint. As the judge found, SEI never sought delay damages and the delayed portion of the job—demolition of the main power plant building—was not part of SEI's lien claim. Under the CLL, SEI sought to be paid for the work it completed between April 2013 and December 2013, which was a small percentage of the total work contemplated under the contract. Even though demolition of the main power plant building was delayed, the credible testimony and documents in evidence support the court's conclusion that SEI continuously worked on other ancillary aspects of the project through December 2013. The CLL entitles SEI to payment for that work.

VI.

There is no basis to overturn the judge's award of counsel fees. "A trial court's award of attorneys' fees generally is not disturbed unless there is a clear abuse of discretion." Patock, 372 N.J. Super. at 390 (citing Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)).[6] Defendants erroneously contend

_____

[6] SEI's construction lien was timely filed and not willfully overstated, therefore we reject defendants' contention that they are entitled to attorney's fees and costs under N.J.S.A. 2A:44A-15(a).

that the judge erred by awarding attorney's fees and costs to SEI under N.J.S.A. 2A:44A-15(b).

The judge found that "from the time [defendants] received notice that Helio Guzman would appear as a witness at trial" to authenticate the daily reports he authored, their defenses "were 'without basis' pursuant to N.J.S.A. 2A:44A-15(b)." Thus, the judge awarded reasonable fees and costs from the time defendants were noticed that Guzman had been located and would testify (February 22, 2017) in the amount of $80,188.26 which was 100 percent of what SEI had requested in its detailed and itemized certification of services. The judge rejected defendants' objections to SEI's certification of services and found "both the amount of time spent and the rates reasonable per the applicable RPCs."

"[W]ithout basis" is defined as "frivolous, false, unsupported by a contract, or made with malice or bad faith or for any improper purpose." N.J.S.A. 2A:44A-15(d). Guzman worked for defendant BTU and his daily reports coupled with his credible testimony established that: (1) SEI's work on the project continued through December 2013 and (2) SEI had completed 16% of the work contemplated under the contract, valued at $592,000 of the total contract price of $3.7 million. That said, SEI sought only $450,000.

Nonetheless, defendants took the untenable position that the court should ignore the testimony of and records kept by Guzman, who was physically present at the project observing the work, in favor of the opinion of Brower and find that the lien was both willfully overstated and untimely filed.

Brower's insistence that SEI's costs were relevant to the amount of the lien is inconsistent with the CLL's plain language which states that the claimant "shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price[.]" N.J.S.A. 2A:44A-3. Consequently, SEI expended a significant amount of money to litigate the matter due to defendants' frivolous defenses that were unsupported by the contract. Given the unique circumstances, it was reasonable for the court to conclude that defendants' defenses were without basis and to award SEI attorney's fees and costs.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION