# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4552-19
     A-4553-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

M.M.W. and A.S.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF B.M.S.,
a minor.

_____

    Submitted June 7, 2021 – Decided July 14, 2021

    Before Judges Currier, Gooden Brown and DeAlmeida.

    On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cape May County, Docket No. FG-05-0017-19.

Joseph E. Krakora, Public Defender, attorney for appellant M.M.W. (Phuong Dao, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.S. (Mark E. Kleiman, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, defendants M.M.W.[1] and A.S. appeal from the May 20, 2020 judgment of guardianship[2] terminating their parental rights to their daughter, B.M.S. (B.S.), born June 2015.[3] M.M.W. contends plaintiff, New Jersey Division of Child Protection and Permanency (Division), failed to prove

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] The judgment was amended on June 3, 2020.

[3] Each defendant has another child from a different relationship. M.M.W. has an adult daughter who was raised by a maternal aunt from the age of seven. A.S. has a child born April 2011, who is in the physical custody of the child's mother.

all four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and the trial court's findings to the contrary are not supported by the record. A.S. contends the Division failed to prove prongs one, two, and four. The Law Guardian supported termination during the guardianship trial and, on appeal, joins the Division in urging us to affirm. Having considered the arguments in light of the voluminous record and applicable legal standards, we conclude defendants' arguments are uniformly without merit and affirm substantially for the reasons stated in Judge M. Susan Sheppard's written opinion, which was read into the record on May 20, 2020. See R. 2:11-3(e)(1)(A).

## I.

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause

3

> serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

On or about March 11, 2019, the Division filed a verified complaint to terminate defendants' parental rights and award the Division guardianship of B.S. We will not recite in detail the circumstances that led to the filing of the guardianship complaint, which began with the emergency removal of B.S. on February 10, 2018, after M.M.W. was transported to the hospital with an unexplained head injury that police suspected was the result of domestic abuse. Although M.M.W. denied domestic violence, both she and A.S. were heavily intoxicated, admitted to smoking marijuana earlier in the evening, and were

A-4552-19

involved in a violent altercation at their house[4] while B.S. was in the home in their care. B.S. was placed with a maternal aunt and her husband who have cared for her since her removal and are committed to adoption. The Division was later granted custody of B.S. pursuant to N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12. During the ensuing litigation spanning over two years, defendants were plagued with substance abuse issues, primarily alcohol related, unstable housing, and erratic employment. Importantly, both defendants failed to maintain sobriety for an extended period despite the Division's efforts.

The guardianship trial was conducted over five non-consecutive days, beginning on October 16, 2019. At the trial, in addition to the admission of numerous documentary exhibits, the Division presented four witnesses, all of whom the judge found credible. Division caseworker Traci Wilson, the custodian of the Division's records, testified about the Division's involvement with defendants, detailing the services provided to reunify the family and help defendants correct the circumstances that led to B.S.'s removal. According to Wilson, in addition to providing visitation and other services, the Division referred both defendants for psychological and substance abuse evaluations,

---

[4] Although the altercation appeared to have involved other parties and prompted a police response to the home, no criminal charges were filed due to lack of cooperation and conflicting witness statements.

substance abuse treatment, and random urine screens. M.M.W. was also referred for a psychiatric evaluation.

Wilson described a pattern wherein defendants would have some success in treatment but then struggle to maintain their progress as evidenced by missed or positive random urine screens, failure to confirm consistent attendance at Alcoholics Anonymous meetings, and repeated police interactions that included reports that one or both defendants were intoxicated. Wilson also explained that although defendants had positive visits with B.S. and maintained contact with the Division, they were evicted from their rental home and resorted to transient housing due to financial difficulties caused by A.S. losing his job and M.M.W.'s unemployment. According to Wilson, defendants' inability to provide B.S. with permanency going on two years prompted the Division to seek termination of parental rights based on balancing B.S.'s need for permanency against defendants' inability to fully complete substance abuse treatment and maintain sobriety.

B.S.'s maternal aunt and resource parent, G.D.,[5] testified that she and her husband were committed to adopting B.S., who got along with her three other daughters, one of whom was the same age as B.S. G.D. had a clear

---

[5] G.D. was also B.S.'s godmother.

A-4552-19

understanding of the difference between adoption and Kinship Legal Guardianship (KLG) and expressed her preference for the former because of the toxic relationship that had developed between her and M.M.W. as well as B.S.'s need for permanency and stability. Nonetheless, G.D. was not opposed to fostering a relationship between B.S. and defendants in the future.

Division witness Dr. Alan J. Lee, Psy. D., was qualified without objection as an expert in clinical and forensic psychology with a special focus in bonding and parenting capacity evaluations. He testified about the psychological and bonding evaluations he conducted, as a result of which he did not recommend reunification with either defendant.

For the defense, M.M.W. testified on her own behalf, seeking reunification and objecting to the termination of her parental rights. She admitted to her struggles with substance abuse, her relapses, her bad life choices, her unsteady employment history, and her unstable housing. However, she claimed that the last time she had alcohol was April 14, 2019, and that she had been clean ever since. Officer Michael Harkin from the Lower Township Police Department testified as a rebuttal witness for the Division about responding to M.M.W.'s home on June 24, 2019, two months after M.M.W. claimed she achieved sobriety. According to Harkin, during the June 24 interaction, M.M.W.

7

appeared inebriated and he detected the odor of alcohol on her. A.S. neither testified nor presented any witnesses.

We incorporate by reference the detailed factual findings and legal conclusions in Judge Sheppard's comprehensive opinion and recite only the judge's key findings supporting her decision. After reviewing the circumstances of the Division's initial involvement with defendants that led to the removal of B.S. from the home, the judge recounted each defendant's pertinent background. Regarding A.S., the judge stated he "has a significant history dealing with substance abuse issues." Indeed, during B.S.'s removal, in addition to admitting to being intoxicated and using marijuana earlier that evening, A.S. admitted to the responding caseworker that he smoked marijuana twice daily while B.S. was in his care.

Regarding M.M.W., the judge stated she also "has a longstanding, not fully treated, history of substance abuse that spans over the course of two decades." The judge noted that M.M.W. "has not been able to maintain sustained sobriety for extended periods of time" despite attending "various Intensive Outpatient Programs ('IOP') and residential programs." Additionally, the judge stated that M.M.W. "was psychiatrically hospitalized on two separate occasions,

8

in 2008 and 2010," and, in 2011, "went to Cape Counseling for mental health intake but was subsequently discharged for failure to pursue treatment."

Further, according to the judge, M.M.W. "was briefly incarcerated in 2006-2007, for the unlawful use of a credit card" and "given parole," which "she violated . . . due to her substance abuse issues, specifically involving the continued use of marijuana, crack cocaine, and cocaine." The judge noted that M.M.W. "began using cocaine and crack-cocaine at the age of twenty,"[6] and "by her own admission," continued using "for approximately twelve years." She "began using marijuana" and "consuming alcohol when she was sixteen[-]years[-]old" and "reported problematic usage" of alcohol "[f]or the past twenty-five years."

Recounting defendants' efforts to address their substance abuse issues following the removal of B.S., the judge related:

> [M.M.W.] completed a substance abuse evaluation in February 2018 and was recommended for IOP. She tested positive for alcohol and marijuana that day. In April 2018, Cape Counseling records indicate [M.M.W.] continued testing positive for alcohol. She was only truthful when confronted with positive screens, failing to admit to relapses and usage . . . . She started her IOP in March 2018, but it was extended because of her continued use. In May 2018, she began missing sessions and had positive screens. She was

---

[6] M.M.W. was born in January 1979.

recommended for inpatient treatment at that time, and she did not attend. On May 17, 2018, [M.M.W.] completed a psychological evaluation with Dr. [Gregory] Gambone, who recommended psychiatric treatment/medication monitoring, successful completion of substance abuse treatment, successful completion of a domestic violence education program, individual psychotherapy, and co-parenting mediation.

According to the judge, M.M.W. continued "testing positive in the [F]all of 2018 and there were reports of police involvement at her home." On May 20, 2019, M.M.W. "was successfully discharged from New Hope and started IOP at Cape Counseling on May 22, 2019." However, the judge noted that she "missed sessions on June 4, 10, 13, 17 and 25, 2019." In August 2019, M.M.W. "completed another round of IOP" but "tested dilute on September 16, 2019, which the service provider deemed a positive test." Additionally, "on November 18, 2019, [M.M.W.] failed to submit to the drug screen." Finally, "in December 2019, [M.M.W.] started relapse recovery but did not show up on December 4, 2019[,] as scheduled."[7] The judge acknowledged M.M.W.'s trial testimony "that she was currently sober," but pointed out that "[t]his assertion was rebutted by Officer Harkins['s testimony,]" which the judge found credible.

---

[7] At the time of trial, M.M.W. had re-engaged in the relapse prevention program.

The judge also explained how M.M.W.'s alcohol use had adversely impacted her visitation with B.S.:

> During the summer months of 2018, the court permitted extended visits that were to occur with both parents. During this period, there were reports of [M.M.W.] smelling of alcohol and of power struggles with the resource parents over schooling, visitation times and haircuts . . . . At this point, the court expanded A.S.'s visits to unsupervised visitation. However, [M.M.W.] still needed to be supervised due to her failure to screen and maintain sobriety, and her disruptive behavior with the resource parents by calling them while she was drunk and threatening them.[8]

Regarding A.S.'s efforts to maintain sobriety, the judge recounted:

> A.S. underwent substance abuse evaluations and was to comply with all treatment recommendations, including but not limited to, inpatient and/or outpatient substance abuse treatment.[9] A.S. has attended counseling and therapy, and other approved substance abuse treatment support meetings. A.S. tested positive for alcohol in October 2019. He then tested positive for unprescribed suboxone in December 2019, and as a result, was

---

[8] During the summer of 2018, the relationship between the parties deteriorated to the point where G.D. "testified that she obtained a temporary restraining order against [M.M.W.]"

[9] In May 2018, A.S. also underwent a psychological evaluation with Dr. Gambone who recommended substance abuse treatment, domestic violence education, individual psychotherapy, and co-parenting mediation with M.M.W. At the time, Gambone also opined that neither parent was capable of independently caring for B.S. and that reunification should not be considered until they participated in services and demonstrated sustained sobriety.

A-4552-19

unsuccessfully discharged from his last treatment program and refused to complete additional services.

The judge also considered both defendants' compliance with the court ordered requirement that they "call the Division daily by 10:00 a.m." and "speak directly to a worker" to arrange for the submission of "random urine screens." Based on the record, the judge concluded that from May to November 2019, defendants failed to comply "for most of each month." The judge acknowledged, however, that defendants "tested negative" "at each scheduled court proceeding."

Importantly, the judge recounted a November 2018 incident related to defendants' continued alcohol use that led to their housing and employment instabilities as follows:

> [O]n November 3, 2018[,] A.S. and [M.M.W.] were involved in a car accident, while driving in A.S.'s work truck, and both sustained injuries. This occurred one week after they failed to submit to screens and missed four sessions and failed to attend an IOP session. It was reported that [M.M.W.] was highly intoxicated at the scene. A.S. was charged with [driving while under the influence (DUI)] and subsequently placed on probation.[10] As a result of the accident, A.S. was fired. At that point, [M.M.W.] was also unemployed. [Defendants] did not have a source of income, and between the two, it was alleged that they had

---

[10] A.S. was also charged with fourth-degree assault by auto, N.J.S.A. 2C:12-1(c)(2).

approximately $700 per month to provide for their family and B.S. [M.M.W.] testified that after the DUI accident they were unable to afford all legal bills, fines, probation, and the child support obligations.

The judge stated that since the accident, "the couple has been moving from home to home and job to job." "Sometime during November and December 2019, [M.M.W.] and A.S. were evicted from their residence and began living in hotels."[11]

Significantly, the judge considered Dr. Lee's "unrefuted and uncontroverted expert testimony regarding the psychological well-being of [defendants] and bonding evaluations between each resource parent and B.S., and each [defendant] and B.S." According to the judge:

> The purpose of the four bonding evaluations was to assess and evaluate the emotional and psychological attachments that the child has with each of these individuals, and for Dr. Lee to provide subsequent recommendations based on the results of the bonding evaluations . . . . Dr. Lee stated that he weighs all relevant information when . . . making his recommendations for permanency. Some of the factors that Dr. Lee considers are the age, development, and needs of the child as well as the psychological assessments conducted on each parent. Further, he considers self-reporting inventories, cognitive and

---

[11] When M.M.W. testified on January 24, 2020, she reported that the couple had moved a third time and was now living in a different motel.

A-4552-19

psychological tests, personality assessment, parenting stress index and child abuse potential inventory. Additionally, Dr. Lee uses performance-based assessments of clinical and personality functioning, including Rorschach and inkblot method. Dr. Lee testified that he also conducts lengthy one-on-one interviews with each parent. Based on these interviews, he factors in his personal observations, the parents declining services from the Division[], and what is purported during the interviews.

The judge explained that Dr. Lee "found there was not a significant or positive bond between [defendants] and [B.S.] and determined there was a low risk that B.S. would suffer severe and enduring harm if those relationships ended." Moreover, Dr. Lee opined that "B.S.'s need for permanency outweighed her [need for] contact with [defendants]." To support his opinion, Dr. Lee testified that while "B.S. enjoyed visiting with her parents, . . . she acted out during the bonding evaluation with [M.M.W.] and . . . cried and wrapped her arms around the resource mother during the evaluation with A.S." Further, "when the resource mother left, B.S. cried for 'mommy,'" prompting A.S. to "correct her" by telling her that the resource mother was her "aunt" and not her "mommy." In rendering his opinion, Dr. Lee was cognizant of the fact that his observations during the evaluations represented a relatively miniscule part of the child's life, but his conclusions were also informed by the fact that B.S. had

14

spent a substantial portion of her young life out of the direct care of defendants and in the direct care of her resource parents.

The judge stated that, in contrast, Dr. Lee "reported that there was a strong and positive psychological attachment between [B.S.] and each resource parent, and that there would be a significant risk of B.S. suffering severe and enduring harm if those relationships ended."  Dr. Lee opined that "for young children of [B.S.'s] age, it is important to have a secure attachment" and B.S.'s "bond with the resource parents [was] the best insurance policy to deal with any disruptions in her life."  According to the judge, Dr. Lee specified that B.S. "would potentially suffer" from behavioral and emotional problems as well as academic impairments "if her relationship ended with her resource parents" and defendants "would be unable to ameliorate . . . or mitigate the risks." Conversely, the resource parents could mitigate any harm to B.S. caused by the termination of defendants' parental rights.

As to permanency, the judge expounded on Dr. Lee's opinion that while "permanency would be unlikely to be achieved with [defendants]," it was "readily available with the resource parents."  The judge noted that Dr. Lee stressed the importance of permanency, which he described as "stability, consistency, [and] predictability" that afforded "[a]n opportunity to grow,

progress, and develop[] in a safe and appropriate fashion rather than languish in states of uncertainty which generates anxiety, angst, and other behavioral and emotional problems."

The judge also considered the fact that Dr. Lee did not support either defendant as an independent caretaker of B.S. at this time or in the foreseeable future, did not recommend reunification with either defendant, and opined that "both defendants have poor prognos[e]s." Specifically, according to Dr. Lee, M.M.W.'s "maladaptive personality and character traits are [chronic] issues that are fairly ingrained" along with her "deep-seeded substance abuse issues dating back many years." Dr. Lee also noted "concerns" that M.M.W.'s "various bouts with relapse" would "delay[] permanency for B.S." and "continu[e] to add harm to B.S. because of the lack of stability." Additionally, Dr. Lee "reported several ongoing concerns with A.S.'s entrenched and maladaptive personality and character traits that adversely impact[ed] his overall functioning and adjustment." According to Dr. Lee, A.S. also "remain[ed] a heighte[ned] risk for criminal recidivism[12] and substance abuse."

---

[12] During his evaluation, Dr. Lee considered A.S.'s self-reported history of arrests for DUI and assault by auto as well as his occasional jail stints.

A-4552-19

In rendering his opinions, Dr. Lee considered reports that defendants had completed some treatment, often tested negative for alcohol and drugs, and regularly visited B.S. Nonetheless, the judge credited Dr. Lee's opinion "that a minor child of B.S.'s age needs consistency . . . . for twelve months, but [defendants] have not provided consistency, have not shown any stability in employment or housing, and have not provided a safe environment for [B.S.]"

After reciting her factual findings, the judge applied the governing legal principles and concluded that "the Division ha[d] met its burden of proof by clear and convincing evidence" that "termination of [defendants'] parental rights" was "warranted under the best interest[s] standard." The judge determined that "[i]n sum, both [M.M.W.] and A.S. have significant history with substance abuse," "have been unable to provide stable housing, employment and maintain consistent sobriety . . . . despite each completing some treatment and attending various programs," and "have not been able to maintain sobriety for an extended period."

The judge explained:

> The Division became involved with [defendants] on February 10, 2018, and since then has attempted to provide services to [them] to reunify them with B.S. However, [defendants] are still not capable of being independent caregivers for B.S., as opined by Dr. Lee, the only expert. The court did not find [M.M.W.'s]

17

testimony credible as to her sobriety. She was not credible that she has been sober since April 2019, as this claim was refuted by Officer Harkins. And, although the court appreciates that [M.M.W.] loves her daughter, the court truly does not believe that she can maintain her sobriety and that she possesses the skill set necessary to parent. Further, [A.S.] did not testify, but based on the uncontradicted testimony of Dr. Lee, he is not capable of independent parenting. He too has failed to complete services or consistently call in for screens, and has tested positive in the [F]all. In contrast, the resource parents have been able to provide a stable, healthy, and nurturing environment for [B.S.] since February 10, 2018, when the child was placed. Lastly, from the credible testimony of the resource mother and worker, KLG does not appear to be a viable alternative to termination of parental rights.

Specifically, regarding prong one, the judge found "by clear and convincing evidence that B.S.'s safety, health[], and development have been and will continue to be endangered by her parental relationship with [defendants]" based on Wilson's and Dr. Lee's "credible testimony that A.S and [M.M.W.] have neglected B.S.'s welfare and have been unable to provide a stable, safe, and healthy environment for the minor child to develop and flourish." See In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) ("A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child."). According to the judge, defendants "have failed to consistently refrain from using substances,"

"have not been fully treated and . . . have long-standing substance abuse issues which have led to continued instability regarding housing, finances, and employment over the course of this litigation."

The judge continued:

> [T]hese substance abuse issues have caused problems with the overall stability for the minor child. From the police involvement on the night of the removal to the present, they have failed to change their behavior. In 2019 alone, [M.M.W.] voluntarily left employment at an Italian restaurant, McDonald's, Burger King, Dollar Tree, and a grocery store. A.S. had been in and out of work since the DUI car accident with his employer's truck, while [M.M.W.] was intoxicated in the passenger seat. Since the start of the litigation, they have lost two apartments for failure to pay rent and are moving every few weeks to different hotels.

Further, the judge credited Dr. Lee's opinion "that neither parent should be considered an independent caretaker for the child, noting that they are immature and have limited parental insight, with a heightened risk for patterns of substance abuse relapse, criminal recidivism and general instabilities."

Turning to prong two, the judge found that defendants "are not necessarily unwilling to but have been unable to provide stability to eliminate the harm facing B.S.," that "the resource parents [have] provide[d] a safe and stable home for [B.S.], and that a delay of permanent placement will only add to [B.S.'s] harm." The judge stressed "[i]t is not just a matter of [defendants] being

19

unwilling to but being unable to refrain from substance abuse problems and maintain sobriety." See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986) (explaining that under prong two, a court "should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care").

The judge elaborated:

> [Defendants] had two years to complete services provided by the Division. They have relapsed during this two-year period and have failed to maintain sobriety for a full calendar year. . . . [B.S.] has resided in a stable environment with the resource parents and resource family during these two years, which is over half of the minor child's life. The prognosis of each parent for significant and lasting change is poor according to Dr. Lee.
>
> Further, based on the evidence presented and uncontroverted testimony of Dr. Lee, the resource parents have strong and positive psychological connections with B.S., as opposed to the connections with [defendants].

In that regard, the judge credited Dr. Lee's uncontroverted opinion that "there would be a significant risk of B.S. suffering severe and enduring harm if th[e] relationships [with her resource parents] ended." See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) ("[H]arms attributable to a biological parent include the prolonged inattention to a child's

needs, which encourages the development of a stronger, 'bonding relationship' to foster parents, 'the severing of which would cause profound harm . . . .'" (alteration in original) (quoting In re Guardianship of J.C., 129 N.J. 1, 18 (1992))).

The judge acknowledged defendants' "attempt[s] to take the necessary and positive steps" but pointed out that defendants "incessantly fall into the same constant struggles" and "have been unable to mitigate issues of instability." The judge explained:

> Due to the substance abuse issues being so pervasive and of such a serious nature, and because of the long-standing, long-ranging use, the parties are unable to refrain from injuring the child. A child's need for permanency and legal policy to provide it expeditiously can only yield to a parent who is making diligent efforts with the child and only needs a reasonable amount of time to complete those efforts. . . .
>
> This court finds that the lack of completion of services by A.S. and [M.M.W.] show an inability to eliminate the perpetuating harm that B.S. has faced and will continue to face if a further delay in permanency continues. Neither parent has presented to the court that they can provide B.S. with stability, and Dr. Lee credibly testified that, in his expert opinion, neither would be able to be an independent caretaker for the minor child.

21

See In re Guardianship of K.H.O., 161 N.J. 337, 348-49 (1999) ("[U]nder [prong two], it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm.").

Turning to prong three, the judge found that "the Division ha[d] unequivocally provided reasonable efforts to develop a plan to reunify [B.S.] with [defendants]," and defendants "show[ed] a capacity and a willingness to participate in [the] services" offered by the Division. Notwithstanding these efforts, the judge determined that defendants "continuously failed to successfully complete services or have only been able to partially complete the recommended services" over the course of two years. Thus, the judge concluded "[i]t was . . . [d]efendants['] lack of commitment that ultimately prevented reunification with [B.S.]" rather than any deficiency in the Division's efforts. See N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 368-69 (App. Div. 2014) ("The reasonableness of the Division's efforts 'is not measured by their success.'" (quoting N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012))).[13]

_____

[13] "'Reasonable efforts' may include parental consultation, plans for reunification, services essential to achieving reunification, notice to the family

22

Further, the judge was satisfied that "there [was] no alternative to [termination of parental rights (TPR)]." In that regard, the judge explained:

> The court initially believed that perhaps KLG was the preferred permanency plan in the best interest of B.S. It is difficult for the court to contemplate termination of parental rights if there is any hope that the parents can work on curing their inadequacies while still maintaining a familial relationship with the child. In this case, initially [defendants] attempted to complete the recommended services and visits. This gave hope to the court. However, as the couple continued to relapse combined with their housing and job instability, this hope diminished. Then, once the court listened to the credible testimony of the resource mother, . . . the court has concluded that KLG is not a feasible alternative to TPR.

In support, the judge pointed to the resource mother's adamant opposition to KLG "based on her first[-]hand observations of what happened when she and other family members raised [M.M.W.'s] adult daughter and the family discord resulting therefrom" as well as the complete deterioration of the resource mother's relationship with M.M.W. The judge also considered the resource mother's compelling testimony about "B.S.'s ongoing difficulties in dealing with the lack of permanency," which the resource mother aptly described as B.S.

---

of the child's progress, and visitation facilitation" as well as "day care, housing assistance, referrals to drug treatment, medical or health care, parenting classes, financial assistance, and the like." N.C.M., 438 N.J. Super. at 368 (quoting N.J.S.A. 30:4C-15.1(c)).

being "constantly . . . torn between two [separate] lives" and "conflict[ed] with who she loves."

The judge determined that, "[a]t this point, it [was] not in the best interest of B.S. to wait for permanency in the hopes [defendants] can maintain their sobriety or that the sisters can mend their relationship." Instead, the judge concluded there were no alternatives to TPR because B.S. was "extremely well cared for in her . . . resource home" and "adoption [was] feasible and likely." See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 558-59 (2014) ("[W]hen the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights." (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004))).

Finally, as to prong four, the judge was satisfied that terminating defendants' parental rights will not do more harm than good. The judge determined there was a significant risk that B.S. would suffer serious psychological or emotional harm by severing her strong bond with her resource parents, that defendants caused the harm to B.S., that delaying permanency to B.S. would cause further harm, and that B.S.'s interest would be best served by completely terminating her relationship with defendants.

In making that determination, the judge

weighed Dr. Lee's unrebutted expert opinion that concluded that the prognosis for [defendants] ever being able to parent B.S. was "poor," because they have not proven they could be successful in their recovery and remain clean for an extended period of time. Further, in his credible testimony Dr. Lee opined that the . . . resource parents could address any harm B.S. would suffer from severing her bond with defendants.

See N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008) (explaining that "[w]hen a parent has exposed a child to continuing harm through abuse or neglect and has been unable to remediate the danger to the child," and "the child has bonded with foster parents who have provided a nurturing and safe home," in those circumstances, "termination of parental rights likely will not do more harm than good"); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007) ("A child's need for permanency is an important consideration under the fourth prong."); N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div. 2007) ("Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement," and since "1997, '[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being.'" (quoting

<u>N.J. Div. of Youth and Family Servs. v. C.S.</u>, 367 N.J. Super. 76, 111 (App. Div. 2004))).

## II.

In this ensuing appeal, M.M.W argues the judge "was wrong in [her] evaluation of the facts and in the legal conclusions [she] drew from the facts." She asserts the judge "failed to consider facts that [were] favorable" to her, such as consistent negative urine screens for drugs or alcohol and positive visits with B.S. She also contends the judge gave "too much weight to Dr. Lee's testimony," which she describes as "a net opinion," and erred in crediting his report which she refers to as "flawed." On the other hand, A.S. argues there was "no evidence . . . to conclusively establish" that his use of alcohol or other substances "ever harmed [B.S.] or subjected her to a risk of such harm." According to A.S., instead, the evidence "show[ed] that [he was] willing and able to parent his daughter and offer her a safe and stable home environment." Further, A.S. asserts the judge ignored his "very close father/daughter relationship which called into question the reliability of Dr. Lee's opinion."

"It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." <u>N.J. Div. of</u>

Youth and Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). "We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." Id. at 427. Although our scope of review is expanded when the focus is on "'the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' . . . . even in those circumstances we will accord deference unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'" M.M., 189 N.J. at 279 (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993); then quoting Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Here, the judge reviewed the evidence presented at trial, made detailed factual findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all the legal requirements for a judgment of guardianship. Contrary to defendants' assertions, the judge's factual findings are amply supported by the record, and her legal determinations are sound. In rendering her decision, the judge properly relied on the uncontroverted expert opinion of Dr. Lee to conclude that termination of parental rights would not do more harm than good given B.S.'s need for permanency, the stronger bond between B.S. and her resource parents compared

to the bond between B.S. and defendants, the severe and enduring harm to B.S. if the bond with her resource parents was broken, defendants' inability to mitigate that harm and to safely parent B.S., and defendants' poor prognoses for change in the foreseeable future. See M.M., 189 N.J. at 281 (explaining the Division's poof in termination proceedings should include the testimony of a well-qualified expert "'who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents" (quoting J.C., 129 N.J. at 19)).

Defendants challenge Dr. Lee's opinions as unreliable and unworthy of consideration. However, Dr. Lee's opinions were based on his interviews, psychological testing, bonding evaluations, and review of the record, and he credibly explained the "facts" and "data" supporting his opinions as required under N.J.R.E. 703. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011) ("[A]n expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered" under N.J.R.E. 703). Clearly, defendants disagree with Dr. Lee's unfavorable opinions. However, defendants' disagreement with Dr. Lee's conclusions does not render them inadmissible net opinions. See Townsend v. Pierre, 221 N.J. 36, 54 (2015) ("The expert's failure 'to give weight to a factor

thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'"  (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002))).

Further, defendants' attempts to parse discrete parts of the record to support their claims are unpersuasive.  The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law.  See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. at 103-07; K.H.O., 161 N.J. at 347-63; D.M.H., 161 N.J. at 375-93; A.W., 103 N.J. at 604-11.  We thus affirm substantially for the reasons Judge Sheppard expressed in her comprehensive and well-reasoned decision.  To the extent we have not explicitly addressed any specific argument raised by defendants in this opinion, it is because the argument lacks sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION